## KEASBEY & MATTISON CO. v. UNITED STATES.

### No. 8197.

Circuit Court of Appeals, Third Circuit.
Argued Feb. 19, 1943.

Decided Feb. 8, 1944.

[31] See footnote 3.

164

Ernest Scott, of Philadelphia, Pa. (Clement J. Clarke, Jr., Philip L. Leidy, and Pepper, Bodine, Stokes & Schoch, all of Philadelphia, Pa., on the brief), for appellant.

Wm. B. Waldo, of Washington, D. C. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Sp. Asst. to the Atty. Gen., Gerald A. Gleeson, U. S. Atty., and T. J. Curtin, Asst. U. S. Atty., both of Philadelphia, Pa., on the brief), for respondent.

Before BIGGS, JONES, and GOODRICH, Circuit Judges.

JONES, Circuit Judge.

This is an appeal by the plaintiff taxpayer from a judgment in favor of the defendant entered by the court below in a suit to recover a portion of the income taxes which the plaintiff was required to pay for its fiscal year ending March 31, 1938. The Commissioner of Internal Revenue having determined a deficiency in tax for the year in question, the taxpayer submitted to an immediate assessment thereof, paid the additional taxes under protest and instituted the suit here involved after the Commissioner had rejected its claim for refund. The case was tried to the court below without a jury. From the findings made by the trial court we derive the following material facts.

The plaintiff, Keasbey & Mattison Company (a Pennsylvania corporation), is engaged in the business of manufacturing and selling asbestos products, some of which are used in the improvement and repair of houses. It sells such products to dealers and distributors, who sell to retailers or applicators, who in turn sell to home owners and perform the service of installing the products which they sell.

For a period prior to the taxable year here involved, the cost of purchases of such materials by home owners was financed through the FHA, which guaranteed to the applicators the notes given in payment by the home owners. This method of financing purchases served to increase greatly the market for the plaintiff's products. Upon the termination of FHA financing in the latter part of 1936, the plaintiff, in order to maintain the widespread market for its products which had thus been built up, entered into a contract on January 26, 1937, with the Bancredit Corporation (hereinafter referred to as the Finance Company).

Under the contract between the plaintiff and the Finance Company, the latter agreed to discount, for applicators, notes of home owning purchasers of the plaintiff's products, for which service the Finance Company was to make a charge of seven per cent of the amount of the notes so discounted. Payment of the notes by the makers was to be arranged on an installment basis. Five of the seven per cent charge made by the Finance Company was to go to the Finance Company as compensation for its financing services, and the balance (two per cent) was to be placed in a reserve fund by the Finance Company to liquidate possible losses from uncollectible notes. The contract authorized the Finance Company to charge against the reserve fund any discounted notes of home owners delinquent for sixty days or more. It further provided that whenever the total reserve fund should exceed ten per cent of the unpaid balance of the outstanding discounted notes such excess should be paid to the plaintiff at its option on January 3rd of each year of the life of the contract and that, upon termination of the agreement and when all installment notes discounted thereunder had been liquidated in full and all sums due the Finance Company had

been paid, any balance remaining in the reserve fund was to be paid to the plaintiff. The contract also contained an express assumption of liability on the part of the plaintiff to the Finance Company for unpaid notes, in addition to the protection afforded by the reserve fund, up to ten per cent of the aggregate amount of notes discounted by the Finance Company under the agreement.[1]

At no time during the taxable year did the amount in the reserve fund exceed ten per cent of the unpaid notes discounted by the Finance Company under the agreement. Nor was any part of the reserve fund either paid or payable to the plaintiff during the taxable year. On the other hand, the aggregate amount of delinquent notes was always less than the amount of the reserve fund during the taxable year so that nothing was paid, nor did anything become payable, by the plaintiff to the Finance Company during the taxable year on account of the plaintiff's assumption of additional liability for delinquent or unpaid notes.

The plaintiff, which kept its books on the accrual basis, did not show as an asset, and therefore did not reflect in its income, any part of the reserve for bad debts set up on the books of the Finance Company under the contract. Neither did the plaintiff include among its liabilities its possible liability to the Finance Company for delinquent or unpaid notes in excess of the reserve fund up to ten per cent of the aggregate amount of the notes discounted by the Finance Company.

The Commissioner held that the reserve fund for delinquent notes shown by the books of the Finance Company ($25,812.56 after a charge thereto of $3,980.23 for currently unpaid notes) was an asset of the plaintiff accruable for the taxable year in question and should have been so accounted for but that the plaintiff's additional liability on account of the notes discounted by the Finance Company during the taxable year (viz., ten per cent of $503,592.21, less the reserve fund) was contingent and therefore not accruable. Accordingly, the Commissioner recast the plaintiff's balance sheet for the taxable year and thereupon determined the deficiency which led to the assessment and tax payment giving rise to the suit involved on this appeal. The court below upheld the Commissioner's determination and entered the judgment for the defendant.

Thus, the court below approved and followed the Commissioner's rulings, viz., (1) that the reserve fund on the books of the Finance Company was an accruable asset of the plaintiff for the taxable year and should have been so reflected in its return of income and (2) that no liability rested upon the plaintiff on account of delinquent or unpaid notes, over and above the reserve fund, which was accruable for the taxable year. The question presented by the appeal is whether the action so taken by the court below constituted error.

█ While approved standard methods of accounting are ordinarily regarded as clearly reflecting a taxpayer's income (Art. 41–2 of Treasury Regulations 101 promulgated under the Revenue Act of 1938), and although the plaintiff's system of accounting (accrual) is an approved method, we

---

[1] The cognate provisions in the contract of January 26, 1937, between Keasbey & Mattison Company and Bancredit Corporation were as follows:

"3. Out of the total discounts so calculated you [Bancredit] will credit to yourself an amount equal to 5% per annum discount, * * * and all of the balance [of a 7% financing charge] shall be credited to a reserve account on your [Bancredit's] books which reserve is to be used and applied as follows:

"a. You [Bancredit] are permitted to charge against this reserve, any paper [notes of applicators' customers] which becomes and remains delinquent sixty days or more according to its original terms.

"b. Whenever the total reserve fund shall exceed ten per cent (10%) of the balance then outstanding on all paper purchased by you under this agreement, such excess shall be paid to us [Keasbey] at our option, on January 3rd, in each year during the life of this contract.

"c. Upon the termination of this agreement and when all installment paper purchased hereunder has been liquidated in full, and all amounts due you [Bancredit] under subdivision 'a.' hereof have been paid, any balance remaining in the reserve fund shall be paid to us [Keasbey].

"4. We [Keasbey] agree to assume a maximum liability of ten per cent (10%) of the aggregate amount of purchases made hereunder, provided, however, that such liability shall be decreased by the amount from time to time remaining in the reserve account, as set forth in the preceding paragraph. * * *"

think that the court below was correct in saying that it was within the Commissioner's discretionary power under Sec. 41 of the applicable Revenue Act[2] to revise and restate the taxpayer's accounts in order clearly to reflect its income. See Brown v. Helvering, 291 U.S. 193, 203, 54 S.Ct. 356, 78 L.Ed. 725. But the question here is not as to the Commissioner's power in such regard but whether, in the exercise of his conceded power, he included as an accruable asset of the plaintiff for the year in question an item which, as a matter of law, did not so qualify. We think that such was the effect of the Commissioner's action in respect of the reserve fund and that, consequently, the court below erred in including in the plaintiff's balance sheet for the year in question, as an accruable asset, the reserve fund shown on the books of the Finance Company.

In our opinion the instant case is indistinguishable from the case of Beaudry v. Commissioner, 43 B.T.A. 1209, where the Board of Tax Appeals in a memorandum opinion held that, where the amount of the reserve on the books of the finance company included no excess which might become due the taxpayer, his income should not be increased by the amount of the reserve fund. Here, likewise, it is not because of any excess in the reserve, either supposed or estimated, that the Commissioner augmented the taxpayer's income. The reserve was always less than the maximum prescribed. Plainly, therefore, there was no reserve excess payable to the taxpayer. In the Beaudry case, an automobile dealer assigned to a finance company notes given him by his customers. Out of the gross financing charges made by the finance company on each note transaction a portion was credited on the books to an account called "dealer's reserve" to take care of any losses that might result to the finance company from notes so purchased by it. The dealer, who kept his books on an accrual

basis, did not reflect on his balance sheet any part of the reserve as an asset. The marked similarity between the Beaudry case and the instant case renders the ruling in the former equally applicable here if the decision of the Board of Tax Appeals in the Beaudry case was correct.

The court below sought to distinguish the instant case from the Beaudry case on the ground that here the ultimate balance of the reserve fund, after payment of all notes discounted under the agreement and payment of all charges due the Finance Company, is to be paid to the plaintiff. But it does not appear from the Board's memorandum opinion that that was not also the situation in the Beaudry case. Indeed, it would seem that one of the purposes of making a reserve of the moneys so retained by the finance company in the Beaudry case was to segregate the residue of the reserve, after the payment of all delinquent notes and the charges due the finance company, for payment to the taxpayer. That such was the intent of the arrangement is further impliedly confirmed by the fact appearing in the Board's opinion that the excess in the reserve at any time over the maximum prescribed amount was payable to the dealer forthwith. But even if the distinction were present in fact, it would not be material to the principle pertinent. Whether any portion of the reserve would ever be payable to the plaintiff at any time was uncertain and unascertainable throughout the taxable year. We think that such is the scope of the principle applied in the Beaudry case and that it accords with the decisions in general.

It is "the right to receive and not the actual receipt" of an amount which determines its accruability. But the right to receive must have become fixed before the right can be said to have accrued. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 185, 54 S.Ct. 644, 78 L.Ed. 1200. Consequently, until the

[2] Sec. 41 of the Revenue Act of 1938, c. 289, 52 Stat. 447, 26 U.S.C.A. Int.Rev. Acts, page 1026, provides in material part:
"Sec. 41. General rule.
"The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been

so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. * * *"

right to an amount becomes accruable through the fixation of the right to receive, the taxpayer is under no obligation to return it as income. Otherwise he would be required to pay a tax on income which he might never have a right to receive. See North American Oil Consolidated v. Burnet, 286 U.S. 417, 423, 52 S.Ct. 613, 76 L.Ed. 1197. In Commissioner v. Cleveland Trinidad Paving Co., 6 Cir., 62 F.2d 85, where a percentage of the contract price for street paving was retained under contract provisions by certain municipalities to guarantee maintenance of the paving for a stipulated period, the court held that the amounts so withheld were not accruable as income to the contractor in the years in which the contracts were completed, the court saying (62 F.2d at page 85) that " * * * the fact that the taxpayer kept its books in most respects upon the accrual basis does not require it to accrue that which is but contingently earned. * * * Until the expiration of the period of guaranty the obligations of the several municipalities remained only a contingent promise to pay." See also Commissioner v. Brown, 1 Cir., 54 F.2d 563, 567, 569; John Graf Co. v. Commissioner, 39 B.T.A. 379, 384; Edwards Drilling Co. v. Commissioner, 35 B.T.A. 341, 345.

Applying the foregoing principles to the facts of the instant case, it follows that no part of the reserve fund was accruable as an asset to the plaintiff during the taxable year. Certainly nothing was payable to the plaintiff by way of reserve excess, for there was none. At no time was the reserve much more than half the amount of ten per cent of the notes discounted by the Finance Company (the amount of reserve necessary before there could be any excess payable to the plaintiff). And, as to what was actually in the reserve, the plaintiff's right thereto was subject to the payment therefrom of all notes, discounted by the Finance Company, which should become delinquent for a period of sixty days or more, and all charges due the Finance Company. Whether the plaintiff would ever acquire a fixed right to receive anything from the reserve fund was contingent and unascertainable throughout the taxable year.

During the taxable year the Finance Company transferred to the plaintiff delinquent discounted notes in an aggregate amount of $3,980.25 and charged the amount thereof to the reserve account. The plaintiff recovered on account of those notes a total sum of $122.29 at an expense of $58.33, leaving a net recovery of $63.96, which it reflected on its books as income received by it in that year. But that was all to which the plaintiff had any fixed or definite right, either directly or indirectly, out of the reserve fund.

We conclude therefore that the court below erred in including in the plaintiff's balance sheet as an accruable asset what, under the law applicable to the indisputable facts, constituted a non-accruable item for the year in question. What we have said as to the non-accruability of the reserve fund applies with equal force to the plaintiff's additional liability for delinquent and unpaid notes which throughout the taxable year remained contingent and uncertain. If, however, the reserve fund were held to be accruable, there could be little less reason for holding the plaintiff's additional liability to be likewise accruable.

In support of the judgment for the defendant entered below, the court relied principally on the case of Shoemaker-Nash, Inc., v. Commissioner, 41 B.T.A. 417, which the appellee now cites as controlling along with the case of Colorado Motor Car Company v. Commissioner, 41 B.T.A. 1342. Both of the cases cited are clearly distinguishable from the present.

The so-called "reserve" in the Shoemaker-Nash and the Colorado Motor Car cases was really not a reserve against possible losses. There was nothing in the contract in either of those cases, so far as the Board's findings of fact disclose, to indicate that the respective finance companies had the right to charge uncollectible notes to the "reserve" account. The "reserve" was in reality nothing more than a plan set up by the finance companies to provide for payment to the taxpayers (automobile dealers) of a portion of the purchase price of the notes. This fact was recognized by the Board, which stated in the Shoemaker-Nash case, 41 B.T.A. at page 423, that " * * * it is, in our opinion, apparent that the sale of [the] notes of automobile purchasers to the finance companies was as much a part of the job carried on by the petitioner [automobile dealer] as the sale of the automobiles themselves * * *."

Moreover, the amount of the "liability" owing by the finance companies to the tax-

payers in the Shoemaker-Nash and Colorado Motor Car cases was definitely determinable since the "reserves" in those cases could not be diminished, as in the present case, by charges against them for delinquent and unpaid notes. The withholding of the "reserve" credit in the cited cases had to do merely with the time of payment of the note proceeds to the dealers. And, consonantly, the Board said in the Shoemaker-Nash case, 41 B.T.A. at page 424,—"For, although the amount of the reserve credit is not immediately paid and does not become immediately payable, there is no showing that it will not be collectible when due or that its collection in the future is improbable." Thus did the Board indicate the distinction between that case and one in which there is a true reserve set up which is not immediately determinable and which may never become payable to the taxpayer because of the contingencies to which it is subject.

There was also a definite agreement in the Shoemaker-Nash and the Colorado Motor Car cases between the taxpaying dealers and the finance companies that the amounts involved in the respective "reserve" accounts in those cases would be paid to the dealers. Here, the agreement went no further than to provide for the payment to the taxpayer of what might remain in the reserve fund after all discounted notes and all charges due the Finance Company had been liquidated.

The judgment of the District Court is reversed.