Blaine **JOHNSON** and his wife, Evelyn K. Johnson, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 7166.

United States Court of Appeals Fourth Circuit.

Argued April 25, 1956.

Decided May 18, 1956.

Albert Simons, Jr., and Huger Sinkler, Charleston, S. C. (Sinkler, Gibbs & Simons, Charleston, S. C., on brief), for petitioners.

Carolyn R. Just, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Robert N Anderson, Attys., Dept. of Justice, Washington, D. C., on brief), for respondent.

Before PARKER, Chief Judge, SOPER, Circuit Judge, and THOMSEN, District Judge.

THOMSEN, District Judge.

The principal question on this petition to review a decision of the Tax Court is whether amounts withheld by finance companies purchasing notes from taxpayer, an accrual basis trailer dealer, and set up and credited to his "dealer's reserve" account on the companies' books as reserves against possible losses, pursuant to agreements between the companies and taxpayer, should be considered taxable income to him (a) in the years in which they are so credited, or (b) in the years in which they become payable to him under the terms of the agreements.

The essential facts are not disputed. Blaine Johnson, whom we will call taxpayer, and his wife filed joint returns for the calendar years 1949 and 1950. From 1946 through 1948, taxpayer and J. B. Coffey, as partners, had bought and sold new and used trailers. As of January 1, 1949, taxpayer purchased Coffey's interest in the partnership, and thereafter operated the business as a sole proprietorship, with his principal place of business at Charleston, South Carolina. He sold almost all of his trailers on the instalment basis; the purchaser would execute a note for the unpaid purchase price, plus insurance, interest, and, in some cases, other charges, and give a chattel mortgage on the trailer as security for payment of the note. These notes and security instruments were executed on forms furnished by the several banks and finance companies with whom taxpayer had arrangements to discount such paper. Taxpayer generally endorsed the notes to the finance company either with recourse or with his guaranty of the unpaid balance of the note. Taxpayer was liable for all amounts that were unpaid on the notes.

The partnership of taxpayer and Coffey had made oral agreements with Lower Main Street Bank and Pioneer Finance Company, and in October, 1948, entered into a written agreement with Minnehoma Finance Company for the sale of such notes. Taxpayer continued these agreements after January 1, 1949, and entered into new oral agreements with Michigan National Bank and Union Bank of Michigan. Taxpayer was not required to do business with any of these companies, although Minnehoma had been organized to assist dealers in financing retail contracts obtained through the sale of a certain brand of house trailers.

As each note was transferred to a finance company, it would remit to taxpayer the balance due him on the selling price of the trailer, less whatever amount was credited on its books to taxpayer's reserve account. In financing these trailer notes, the several finance companies did not give consideration to the fair market value of the individual notes, but purchased all of them at the rate and on the terms fixed by their respective agreements. The amount withheld and credited to the reserve account was usually 5 percent of the unpaid balance on each note, although the percentage varied with the company, the kind of trailer, and the length of the finance period.

The original agreement with Minnehoma, executed on October 4, 1948, did not provide for withholding a portion of the note as a reserve, but it was amended on February 16, 1949, to set up a reserve account to which 5 percent of the unpaid note plus one-sixth of the finance charge would be credited. The establishment of this account was required by the financial institution which financed Minnehoma. New agreements dated May 24, 1950, and November 1, 1950, respectively, provided that the discounted portion of the note was still to be credited to the reserve account, but Minnehoma also agreed to place part of the finance charge in the reserve account.

Each of the agreements provided that if a retail purchaser's contract became due and unpaid, the finance company could charge taxpayer's reserve with the unpaid balance; that if taxpayer had a matured financial obligation of any nature to the company, the amount of the obligation could be charged to the reserve; and that repossession losses could be charged to the reserve. All the agreements provided that the ultimate balance in the reserve account would be paid to taxpayer whenever all indebtedness for which it was security had been discharged.

Pioneer and Union also agreed that they would pay taxpayer from time to time any portion of the reserve which exceeded 10 percent of the total balance outstanding on the notes. The corresponding percentage for Minnehoma was originally 20 percent and was later changed to 15 percent. Michigan agreed to return all sums in the reserve in excess of 10 percent of the gross unpaid balance of all contracts outstanding on March 31 of each year if, in the bank's opinion, taxpayer was in good standing.

A typical transaction may be illustrated as follows:

| | |
|---|---|
| Sales price of trailer | $4,500.00 |
| Down payment or trade-in allowance | 1,500.00 |

| | |
|---|---|
| Balance due taxpayer | $3,000.00 |
| Insurance for one year | 90.00 |
| | $3,090.00 |
| Interest on note for 48 months ($3,090.00 at 6% for 4 years) | 741.60 |
| | $3,831.60 |
| Insurance on remainder of loan | 270.00 |
| Total amount of note | $4,101.60 |
| Balance due taxpayer | $3,000.00 |
| Credited to taxpayer's reserve | 150.00 |
| Cash paid taxpayer by finance company | $2,850.00 |

During the tax years involved taxpayer recorded such a transaction on his books as follows:

| | |
|---|---|
| Cash | $1,500.00 |
| Contracts receivable —Finance Co. | 3,000.00 |
| Trailer sales | $4,500.00 |

When the finance company remitted its check, the following entry was made:

| | |
|---|---|
| Cash | $2,850.00 |
| Finance reserve | 150.00 |
| Contracts receivable—Finance Co. | $3,000.00 |

On taxpayer's books of account and tax returns his sales were recorded on an accrual basis.

On December 31 of each year, when taxpayer's books were closed for the purpose of determining profit or loss for the year, the "Finance Reserve" account was closed to "Profit and Loss". When taxpayer received any portion of the reserves held by the finance companies, he credited the "Finance Reserve" account. On his tax returns and financial statements, the debits to the "Finance Reserve" account for notes sold were deducted from gross sales and the credits in the "Finance Reserve" account were shown as other income.

When taxpayer purchased Coffey's interest in the partnership, he acquired the benefits and obligations of the Lower Main, Minnehoma, and Pioneer agree-

ments. On that date the aggregate of the reserves with Lower Main and Pioneer, which were the only dealer reserves of the partnership, amounted to $11,220.-27. This amount was received by taxpayer from Lower Main and Pioneer in three payments: $2,984.78 in 1949, $1,-673.42 in 1950, and $6,562.07 in 1951. Prior to January 1, 1949, the reserves had been carried on the books of the partnership as accounts receivable. The amounts added to the reserves prior to that date were considered as income when credited, and therefore were not reported as taxable income by taxpayer when collected in 1949, 1950, and 1951. In addition to the above amounts, taxpayer received from reserves with Lower Main and Pioneer $2,000.08 in 1951 and $2,115.41 in 1952, which amounts were reported by taxpayer as taxable income in the returns filed by him and his wife for those years. Prior to filing the return for 1949, the first year during which taxpayer had operated the trailer business as a sole proprietorship, taxpayer's accountant concluded that the reserves withheld by the finance companies should be treated as deductions from sales, and set up taxpayer's books to reflect this accounting method. He testified that before making out the returns he ascertained that the trailer industry generally treated dealer finance discounts in that way.

In the balance sheets for 1949 through 1952, which were used for credit purposes, taxpayer showed the reserve accounts as assets of his trailer business. The 1949 balance sheet did not include as an asset reserves deducted by the finance companies during 1949. The balance sheets for 1950, 1951, and 1952 included the accumulated reserves as an asset, with a footnote that since January 1, 1949, the reserve deductions had been treated as a deduction from income on the profit and loss statements. The accumulated reserves were shown in this way on the 1950, 1951, and 1952 statements because the finance companies had requested that the accumulated reserves

be shown on the statements in this manner.

During the calendar years 1949 and 1950 taxpayer was at no time delinquent in any payments due the finance companies, and most of the trailer purchasers were paying their notes when due. However, in 1949 and 1950 a number of delinquent notes were charged to taxpayer's reserves by the finance companies. Minnehoma, under its contract with taxpayer, could make direct demand upon taxpayer for any default, or at its option could charge defaults against his dealer reserve account. Minnehoma chose the former course, and taxpayer paid the claims. On his 1949 and 1950 income tax returns taxpayer took deductions for these default payments made to the finance companies.

As of December 31, 1948 through 1952, the reserve balances (excluding the additional reserve credits made by Minnehoma) were as follows: 1948, $11,220.27; 1949, $22,255.73; 1950, $44,729.62; 1951, $66,617.52; 1952, $102,653.77.

Excluding the additional reserve credits made by Minnehoma, the finance companies credited $14,020.14 in 1949 and $24,147.41 in 1950 to taxpayer's reserve accounts on their books. On his tax returns for 1949 and 1950, taxpayer deducted these amounts from gross sales. In computing the deficiencies, the Commissioner added these amounts to net income.

Minnehoma credited taxpayer's reserve account with $4,816.32 and $12,-112.80 in 1949 and 1950, respectively, as taxpayer's portion of the finance charges for those years. Taxpayer did not include these amounts in income on the respective tax returns nor did he make any entry on his books for these credits. In the notice of deficiency, the Commissioner included these amounts in income for the respective years.

Taxpayer's gross sales in 1949 were $510,581.46; in 1950, $767,554.74; in 1951, $1,214,982.36; and in 1952, $1,411-399.07. During the years 1949 and 1950

the accumulated reserves held by Michigan and Minnehoma, respectively, and taxpayer's contingent liability to them were as follows:

| Year | Michigan Acc. Res. | Michigan Contin. Lia. | Minnehoma Acc. Res. | Minnehoma Contin. Lia. |
|------|------|------|------|------|
| 1949 | $ 2,347.07 | $ 44,717.86 | $ 6,887.98 | $148,454.90 |
| 1950 | $11,287.56 | $205,936.92 | $21,720.73 | $414,649.12 |

Under the terms of the agreements with Michigan and Minnehoma, taxpayer was not entitled to receive any of these reserves during 1949 or 1950. Taxpayer made repeated efforts to secure parts of these reserves from Michigan and Minnehoma during the years 1949 and 1950 but was unable to obtain any parts of either reserve during the years 1949 to 1953, inclusive. Taxpayer received part of the reserve from Union in 1954, but only because he had stopped doing business with that Company.

The Tax Court held that the respective amounts of the dealer reserves withheld by the finance companies during 1949 and 1950 and credited to taxpayer's account on the finance companies' books were includible in taxpayer's taxable income for those years. From that decision, taxpayer has appealed to this court.

■■■ The Tax Court found as a fact that on taxpayer's books of account and tax returns his sales were recorded on an accrual basis. Taxpayer argued before the Tax Court and in this court that his books of account were not maintained on an accrual basis, and that he was entitled to file his returns on a cash basis. But inventories were an essential part of taxpayer's accounting, and for that reason if for no other, his reporting would necessarily have to be on an accrual basis. Treasury Reg. 111, sec. 29.41-2; Herberger v. Commissioner, 9 Cir., 195 F.2d 293, 295, certiorari denied 344 U.S. 820, 73 S.Ct. 17, 97 L.Ed. 639. Moreover, under section 41 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 41, the Commissioner was justified in revising and restating taxpayer's accounts in order clearly to reflect his income. Brown v. Helvering, 291 U.S. 193, 203, 54 S.Ct. 356, 78 L.Ed. 725; Keasbey & Mattison Co. v. U. S., 3 Cir., 141 F.2d 163. But the important question here is not the Commissioner's power in that regard but whether, in the exercise of his conceded powers, he included as accruable assets for the years in question items which did not so qualify.

■■■ The general principles which must control our decision have been authoritatively stated by the Supreme Court. It is "the right to receive and not the actual receipt" of an amount which determines its accruability. "When the right to receive an amount becomes fixed, the right accrues." Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 185, 54 S.Ct. 644, 645, 78 L.Ed. 1200. Until the right to an amount becomes accruable through fixation of the right to receive, the taxpayer is under no obligation to return it as income. Otherwise, he would be required to pay a tax on income which he might never have a right to receive. North American Oil Consolidated v. Burnet, 286 U.S. 417, 423-424, 52 S.Ct. 613, 76 L.Ed. 1197.

These principles have been applied by other courts and by this court to postpone the accruability of various types of reserves where the taxpayer's right to receive the money was dependent upon some contingency: Commissioner of Internal Revenue v. Cleveland Trinidad Paving Co., 6 Cir., 62 F.2d 85 (percentage of the contract price for street paving retained under contract provisions by municipalities to guarantee maintenance of the paving for a stipulated period); Keasbey & Mattison Co. v. U. S., 3 Cir., 141 F.2d 163 (reserve withheld by a finance company from an asbestos manufacturer which had guaranteed home owners' notes discounted by the finance

company for applicators of the taxpayer's product); U. S. v. Fidelity & Deposit Co., 4 Cir., 177 F.2d 805; Id., 4 Cir., 178 F.2d 753 (reserves required by law to be set up against unearned premiums and losses on risks reinsured with another company not authorized to do business within the state); and authorities cited in those opinions.

No case involving reserves withheld by finance companies from a trailer dealer or an automobile dealer has been decided by any United States Court of Appeals. But the Third Circuit in Keasbey & Mattison discussed at length two B.T.A. cases involving reserves withheld from automobile dealers; namely, Shoemaker-Nash, Inc., 41 B.T.A. 417, and Beaudry, 43 B.T.A. 1209. Shoemaker-Nash is the leading case in the Tax Court, but the direction in which it leads is doubtful. Compare the construction given to it by the Tax Court in the instant case, 25 T. C. 123 with the construction given to it by the Third Circuit in Keasbey & Mattison and by the Tax Court in Royal Motors, Inc., (July 24, 1945) Memo.Op. Docket 5380; Town Motors, Inc., (July 24, 1946) Memo.Op.Docket 2697; and Ray Woods Used Car, Inc., (Sept. 30, 1952) Memo.Op.Docket 32062. The Janus-like character of Shoemaker-Nash is probably due to the failure of the parties in that case to submit a full stipulation of facts or to offer proof at the hearing, so that the court had to infer certain facts from the notice of deficiency. In Royal Motors, the Tax Court, discussing Shoemaker-Nash, said:

> "We pointed out, and the Circuit Court of Appeals for the Third Circuit in Keasbey and Mattison, supra, recognized the soundness of our view, that the amounts placed in the so-called reserve were not true reserves but were nothing more than part of a plan set up by the finance company to provide for payment to the dealer of a portion of the purchase price of the notes."

The Third Circuit in Keasbey & Mattison followed Beaudry, where an automobile dealer had assigned to a finance company notes given him by his customers, and the Board of Tax Appeals held that where the amount of the reserve on the books of the finance company included no excess which was payable to the taxpayer, his income should not be increased by the amount of the reserve fund. In the case at bar, as well as in Beaudry and in Keasbey & Mattison, the reserves were always less than the maximum prescribed by the agreements, so that there was no reserve excess payable to the taxpayer. And in each case the reserve fund was subject to the payment of all notes discounted by the finance company. As the court said in Keasbey & Mattison: [141 F.2d 167] "Whether the plaintiff [taxpayer] would ever acquire a fixed right to receive anything from the reserve fund was contingent and unascertainable throughout the taxable year."

█ In the case at bar the Commissioner argues that the sale of a trailer and the sale of the notes resulting therefrom were separate and distinct transactions. Such an argument, however, ignores the realities. Before a trailer was sold, taxpayer knew which company was going to finance the transaction. The note and the chattel mortgage were executed on printed forms provided by the particular finance company which was going to discount the note. These forms called for monthly payments to be made at the principal office of the finance company in Tulsa, Oklahoma, Grand Rapids, Michigan, etc. None called for any payments to be made to taxpayer in Charleston, South Carolina. The pattern of each sale was a single transaction from the time the trailer was sold through the time the note was discounted by the particular finance company on whose forms it was executed. Taxation is a practical matter; the substance of what is done and not the form must govern. U. S. v. Maryland Jockey Club, 4 Cir., 210 F.2d 367, 371; Commissioner of Internal Revenue v. Ashland Oil & Refining Co., 6 Cir., 99 F.2d 588, 591, certiorari denied 306 U.S. 661, 59 S.Ct. 786, 83 L.Ed. 1057. "Without regard to whether the result

is imposition or relief from taxation, the courts have recognized that where the essential nature of a transaction is the acquisition of property, it will be viewed as a whole, and closely related steps will not be separated either at the instance of the taxpayer or the taxing authority. Prairie Oil & Gas Co. v. Motter, 10 Cir., 66 F.2d 309; Tulsa Tribune Co. v. Commissioner, 10 Cir., 58 F.2d 937, 940; Ahles Realty Corp. v. Commissioner, 2 Cir., 71 F.2d 150; Helvering v. Security Savings [& Commercial] Bank, 4 Cir., 72 F.2d 874." Commissioner of Internal Revenue v. Ashland Oil & Refining Co., supra, 99 F.2d at page 591.

◼ The Tax Court in the instant case based its opinion, in part, upon a finding "that it was taxpayer's practice to charge off immediately on a specific bad debt approach each item on which a charge was made to the reserves and which was found to be uncollectible". From this the court concluded: "Were these reserves to be excluded from petitioner's net income either as deductions or reductions in his gross income, he would, in effect, be securing the benefit of two inconsistent practices". The supposed fact upon which this conclusion is based is not supported by the record. It is true that in 1949 and 1950 a number of delinquent notes were charged to taxpayer's reserve by the finance companies; but it was conceded by the government at the hearing of this appeal that no deduction for these charges was taken by taxpayer in his income tax returns for 1949 and 1950. Most of the notes which became delinquent had been pledged to Minnehoma, and the unpaid balances were collected by that company from taxpayer, in cash, as it had a right to do under its agreement; they were not charged against the reserve. There has been no double deduction, and taxpayer is not securing the benefit of two inconsistent practices.

The Tax Court was in error in holding that the dealer reserves withheld during 1949 and 1950 constituted income to taxpayer during those years, and the decision appealed from must be

Reversed.