WEST PONTIAC, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54984. Filed January 31, 1957.

*Ronald L. Davis, Esq.*, and *Maurice Glazer, C. P. A.*, for the petitioner.

*William H. Gray, Esq.*, for the respondent.

OPINION.

BRUCE, *Judge:* Respondent determined deficiencies in petitioner's income tax for the years 1949 and 1950 as follows:

| Year | Deficiency |
| --- | --- |
| 1949 | $1,654.62 |
| 1950 | 4,404.06 |

Petitioner concedes its liability for the full amount of the deficiency for the taxable year 1949. The sole issue is whether respondent correctly included in petitioner's income for the year 1950 an amount representing the increase in petitioner's dealer's reserve with a finance company from March 10, 1950, until December 31, 1950.

All of the facts were stipulated and are so found and incorporated herein by this reference.

Petitioner is a corporation organized and existing under the laws of the State of Louisiana, with its principal place of business in Monroe, Louisiana, and is engaged in the business of buying, selling, and servicing new and used cars. It keeps its books and prepares its income tax returns on a calendar year basis and on an accrual method of accounting. Petitioner filed its Federal income tax returns for the years 1949 and 1950 with the collector of internal revenue for the district of Louisiana,

During the calendar year 1949 petitioner discounted its automobile paper with the General Motors Acceptance Corporation (hereinafter called G. M. A. C.) under a plan whereby G. M. A. C. placed in reserve for petitioner's account a specified percentage of the aggregate of all automobile paper so discounted. During said period such reserves were withdrawable by and subject to the order and control of petitioner.

On December 31, 1949, the accrued balance in petitioner's reserve account with G. M. A. C. was $7,046.16. Petitioner concedes that such reserves as accrued during the year 1949 were taxable income for the year 1949 and therefore accepts its liability of $1,654.62 for the year 1949, as set forth in the notice of deficiency dated July 8, 1954.

From January 1, 1950, to March 10, 1950, petitioner discounted automobile paper with G. M. A. C., in accordance with the plan mentioned above, and accumulated as a reserve during this period the sum of $1,700.84, computed as follows:

Balance in reserve account, Dec. 31, 1949_____ $7,046.16
Balance in reserve account, Mar. 10, 1950_____ 8,747.00

Increase in reserve from Jan. 1 to Mar. 10, 1950_____ $1,700.84

Petitioner concedes that reserve retained by G. M. A. C. in the amount of $1,700.84 accrued during the year 1950 and is taxable income returnable for that year.

On March 10, 1950, petitioner's previous arrangement with G. M. A. C. was changed, and on that date petitioner entered into a contract with G. M. A. C. designated as the Reserve Guaranty Plan, which contract was in full force and effect according to its terms and tenor from the date of execution and was not modified or changed during the years 1950 or 1951 and which provided as follows:

RESERVE GUARANTY PLAN

It is AGREED by and between GENERAL MOTORS ACCEPTANCE CORPORATION, hereinafter referred to as GMAC, and West Pontiac, Inc., hereinafter referred to as Dealer:

With respect to outstanding retail contracts heretofore purchased by GMAC and such contracts as GMAC may hereafter purchase from Dealer, the terms and provisions of the GMAC Retail Plan governing the method of settling Dealer's responsibility for the unpaid balance under such retail contracts and governing the settlement of Dealer's reserve are hereby modified as follows:

1. Dealer authorizes GMAC, upon Dealer's written request, to resell any repossessed car to which title has been cleared, for Dealer's account and at his cost and expense, at the best price deemed by GMAC in its judgment to be then obtainable in a private sale, and to apply the net proceeds of such resale to payment of the amount for which Dealer is responsible to GMAC, under its Retail Plan, in respect of the retail contract covering the repossessed car. GMAC shall remit to Dealer any surplus of such proceeds of resale. In

the event that the net proceeds of such resale, when applied to payment of Dealer's obligation, are insufficient to discharge Dealer's obligation, Dealer authorizes GMAC, and GMAC agrees, to charge the deficiency against the reserve fund standing on GMAC's books to the credit of Dealer, in payment of that portion of Dealer's obligation which exceeds the applied net proceeds of resale. It is expressly understood and agreed that if at any time such a deficiency is established Dealer's reserve fund is less than the amount of the deficiency, Dealer shall be released from said obligation to GMAC to the extent that the deficiency exceeds the amount of the reserve fund held by GMAC to Dealer's credit.

2. Settlement of the reserve account held on GMAC's books for Dealer will be made annually on the 10th day of March, except as hereinafter specifically provided. During each period ending on the settlement date, GMAC will continue, on the same basis as heretofore, to credit Dealer's reserve account with the reserve accruing from retail contracts purchased from Dealer during such period, and to accumulate and hold such reserve credits in the account pending settlement.

3. If on the annual settlement date, after crediting reserve accruals from retail contracts purchased from Dealer during the settlement period and the deduction of any charges pursuant to paragraph 1 herein during that period, the reserve fund held for Dealer's account exceeds a sum equal to 4% of the retail contracts outstanding, the surplus will be paid to Dealer.

4. GMAC reserves the right upon written notice to the dealer at any time to discontinue the annual settlement in the event or for the reason that it deems the dealer substantially to have discontinued submitting retail contracts to it, whether by virtue of liquidation of the dealer's business or for any other reason. In that event, the reserve account shall not be settled, with respect to retail contracts theretofore purchased from Dealer and then outstanding, until such retail contracts shall have been completely liquidated, at which time GMAC will pay to Dealer the balance, if any, then standing in the reserve account after deduction of any charges against same pursuant to paragraph 1 herein.

5. This agreement shall continue until terminated upon written notice by either party to the other, effective on the subsequent annual settlement date.

6. Upon notice duly given to Dealer that a retail contract submitted for purchase does not sufficiently conform to standard requirements so as to come within the scope of this agreement, GMAC may, at its option, purchase such contract which will not be subject to the provisions of this agreement. Retail contracts covering passenger cars of any model older than six years, and used trucks, are expressly excluded from the scope of this agreement.

From March 10, 1950, until December 31, 1950, petitioner accumulated reserves amounting to $8,785, computed as follows:

Balance in reserve account on Mar. 10, 1950 _____ $8,747
Balance in reserve account on Dec. 31, 1950_____ 17,532

Increase in reserve during period from Mar. 10 to Dec. 31, 1950 _____ $8,785

Petitioner's reserve account with G. M. A. C. was not reflected on the profit and loss statement attached to petitioner's corporation income tax return for 1950, but it was reflected on petitioner's balance sheet as one of the "surplus reserves" under "Liabilities." The balance sheet attached to petitioner's tax return for 1950 also contained an

item representing notes and accounts receivable less reserve for bad debts, in an amount not material herein.

Respondent determined that the net increase in the reserve for contracts sold to G. M. A. C. constituted taxable income. Petitioner contends, however, that the $8,785 increase in the reserve account during the period March 10, 1950, to December 31, 1950, is not taxable income in 1950 because petitioner did not have the right to receive any part of the accumulated reserves until March 10, 1951.

In its petition to this Court, petitioner stated the reason for its contention as follows:

(c) In view of the fact that the basis of settlement each year between petitioner and General Motors Acceptance Corporation was contingent on the amount of outstanding accounts as of March 10th, it had no way of determining this source of income by December 31st of each year, nor was it entitled to any of it until the close of the contract year.

The general rule with respect to the accruability of items of income was spelled out by the Supreme Court in *Spring City Foundry Co.* v. *Commissioner*, 292 U. S. 182. In that case, petitioner, an accrual basis taxpayer, sold goods in 1920 for a specified amount which was represented by open account and unsecured notes. In December 1920, a petition in bankruptcy was filed against the purchaser and a receiver was appointed. In 1922 the receiver paid petitioner a dividend of 15 per cent and in 1923 a second and final dividend of 12½ per cent. Petitioner claimed the entire amount of the debt as a deduction from its income tax for the year 1920, the Commissioner disallowed the claim, and the petitioner attacked the Commissioner's determination. On appeal to the Supreme Court, petitioner argued that the debt, to the extent that it was determined to be worthless in 1920, was not returnable as gross income at all. In rejecting this contention, the Supreme Court observed:

Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. * * *

The Supreme Court further pointed out that the contingency that amounts accrued as income may become uncollectible does not change the rule, for "[i]f such accounts receivable become uncollectible, in whole or part, the question is one of the deduction which may be taken according to the applicable statute." It was thereupon held that the amount of the purchase price was properly accruable in 1920 but that the debt was not deductible until the amount determined to be uncollectible had been ascertained.

This Court has consistently followed *Spring City Foundry Co.* v. *Commissioner, supra,* in cases involving dealer's reserves and has held

that the amounts in the reserves represent accrued income to the dealer. See *Shoemaker-Nash, Inc.*, 41 B. T. A. 417 (1940); *Blaine Johnson*, 25 T. C. 123, revd. (C. A. 4, 1956) 233 F. 2d 952; *Albert M. Brodsky*, 27 T. C. 216 (1956); *Texas Trailercoach, Inc.*, 27 T. C. 575 (1956).

The initial difficulty in applying the holding of the *Spring City Foundry Co.* case to this proceeding is that the stipulation of facts is incomplete. Nothing contained therein or in petitioner's tax returns discloses whether petitioner included gross sales in its profit and loss statement for the taxable year 1950 or whether petitioner reported sales reduced by the amounts credited to its dealer's reserve account. However, since petitioner concedes that the amount credited to the reserve account was taxable income until the reserve guaranty plan went into effect on March 10, 1950, and because neither party has raised the issue either in the pleadings or on brief, we assume that the sales figures reported by petitioner in its tax returns refer to net sales for the year. It therefore appears that during the period March 10, 1950, to December 31, 1950, a specified percentage of the amount of petitioner's retail sales was transferred from petitioner's books to a reserve account kept by G. M. A. C. and that the amounts reflected in the reserve account were never included in petitioner's sales figures for 1950. As these amounts were credited to its reserve account, however, petitioner's right to receive them became fixed because under the terms of the reserve guaranty plan the reserve was to be used for petitioner's benefit in three ways: (1) The reserve account was chargeable with obligations of petitioner which resulted from repossession losses; (2) if the reserve fund on the annual settlement date exceeded 4 per cent of the retail contracts outstanding, the surplus was to be paid to petitioner; (3) if G. M. A. C. discontinued the annual settlement, petitioner was entitled to receive the balance remaining in the reserve account less deductions for outstanding repossession losses. Petitioner earned the amounts contained in the reserve account as surely as if it had received cash for all of its sales. In fact, if petitioner had made no financing arrangement with G. M. A. C., it could have correctly reflected its income only by including in gross sales for the year *all* receipts from retail sales and would therefore have reported as income those very funds which it now seeks to immunize from taxation during the period involved. We fail to see why a different result should be reached where a finance company kept part of the receipts in a separate reserve account for petitioner's benefit. Cf. *Texas Trailercoach, Inc., supra*. Accordingly, we hold that the amount of $8,785 which represents the increase in petitioner's reserve account with G. M. A. C. during the period from March 10, 1950, to December 31

1950, is taxable income to petitioner in 1950. *Spring City Foundry Co.* v. *Commissioner, supra.*

It is true that since repossession losses not recovered by G. M. A. C. upon resale of a repossessed automobile were chargeable against the reserve fund, the *amount* contained in the reserve account would be reduced by the amount of repossession losses charged against it. If repossession losses were heavy, it is conceivable that the reserve account would never exceed 4 per cent of the outstanding contracts. But this contingency did not affect petitioner's original *right to receive* the amounts accrued in the reserve. If the reserve account was reduced as a result of a repossession loss, the question would be that "of the deduction which may be taken according to the applicable statute," and not whether the reserve was returnable as gross income at all. *Spring City Foundry Co.* v. *Commissioner, supra.* Cf. *Josef C. Patchen*, 27 T. C. 593 (1956). Petitioner maintained a reserve for bad debts on its balance sheet, and was entitled to deduct a reasonable addition to such reserve in computing net income for the taxable year. Sec. 23 (k), I. R. C. 1939; Regs. 111, sec. 29.23 (k)–5. However, petitioner has made no claim that it is entitled to a deduction for repossession losses charged to its reserve account. Moreover, a reserve for contingencies not expressly provided for by statute may be deducted only in the year when it represents fixed and definite liabilities which have been incurred. *Brown* v. *Helvering*, 291 U. S. 193. In any event, as stated above, the question of deductibility of repossession losses has no bearing on the issue whether the amount of the reserve account is taxable income in the year of accrual.

Petitioner relies strongly upon *Johnson* v. *Commissioner*, 233 F. 2d 952, which held that the amount of a dealer's reserve on the books of a finance company was not taxable income to the dealer. There the Court of Appeals stressed the fact that the dealer's reserve involved was always less than the maximum prescribed in the agreement so that there was never any excess payable to the dealer. In the instant case there is no evidence as to the amount of retail contracts outstanding at the end of the taxable year, nor is there any proof of the amounts of repossession losses charged to the reserve, if any. It does not appear, therefore, that any repossession losses were charged against the reserve during the taxable period involved, and that the entire amount of the increase in the reserve account was not at all times in excess of 4 per cent of the retail contracts outstanding. Under these circumstances petitioner would be entitled to receive the $8,785 increase in cash which is clearly taxable income. Since petitioner has failed to prove that the entire amount of the reserve account increase was not in excess of 4 per cent of the outstanding contracts, *Johnson* v. *Commissioner, supra*, is not applicable.

If we are mistaken in our conclusion that the instant case is distinguishable from *Johnson* v. *Commissioner*, we must nevertheless decline to follow it. In *Texas Trailercoach, Inc.* and *Albert M. Brodsky*, both *supra*, we had occasion to reexamine our decision in the *Blaine Johnson* case and declined to follow the reversal thereof by the Court of Appeals. For the reasons set forth in those cases and here, with due respect and deference to that court, we feel compelled to adhere to our previous decisions and decline to follow the decision of the Court of Appeals in *Johnson* v. *Commissioner, supra.*

*Decision will be entered for the respondent.*