Vance L. Wiley and Lucille J. Wiley, Husband and Wife v. Commissioner. Frank D. Wiley and Wendla Anita Wiley, Husband and Wife v. Commissioner.
Wiley v. Commissioner
Docket Nos. 54454, 54455.
United States Tax Court
T.C. Memo 1957-236; 1957 Tax Ct. Memo LEXIS 14; 16 T.C.M. (CCH) 1089; T.C.M. (RIA) 57236; December 23, 1957
*14 William Waller, Jr., Esq., American Trust Building, Nashville, Tenn., for the petitioners. George L. Hudspeth, Esq., for the respondent. OPPER
Memorandum Findings of Fact and opinion OPPER, Judge: In these consolidated proceedings respondent determined the following income tax deficiencies and additions to tax: Additions to Tax
Sec. 294
Sec. 294
Petitioner
Year
Deficiency
(d)(2)
(d)(1)(B)
Vance L. Wiley and Lucille J. Wiley
1950
$ 6,307.22
$ 658.76
1951
14,395.70
1,365.76
$178.28
Frank D. Wiley and Wendla Anita Wiley
1950
6,307.24
643.76
1951
14,477.66
1,380.94
208.63 By amended answers respondent affirmatively pleaded the following additional deficiencies and additions to tax: Additions
to Tax
De-
Sec. 294
Petitioner
Year
ficiency
(d)(2)
Vance L. Wiley and
Lucille J. Wiley
1950
$ 990.32
$ 59.42
1951
2,662.48
159.74
Frank D. Wiley and
Wendla Anita Wiley
1950
990.34
59.42
1951
2,662.46
159.74
The main issue is whether sums credited by financial institutions to the reserve accounts of a partnership of which petitioners Vance L. Wiley *15 and Frank D. Wiley were members, which credits represented a portion of the finance charges on installment trailer sales made by the partnership, were taxable income to petitioners in 1950 and 1951. The additions to tax imposed under section 294(d)(2), Internal Revenue Code of 1939, are contested only insofar as they relate to the main issue. Other issues raised by amended answers and amended petitions have been conceded by either petitioners or respondent. Findings of Fact The stipulated facts are hereby found. Petitioners Vance L. Wiley and his wife, Lucille J. Wiley, and Frank D. Wiley and his wife, Wendla Anita Wiley, filed joint income tax returns for 1950 and 1951 with the collector of internal revenue for the district of Tennessee. Vance L. Wiley and Frank D. Wiley, hereafter called petitioners, were equal partners of Wiley Trailer Mart, hereafter called the partnership, which had its principal offices in Nashville, Tennessee, and branch offices in Memphis, Knoxville and Tullahoma, Tennessee, and Camp Campbell, Kentucky. In 1950 and 1951, the partnership kept its books and records on an accrual basis and filed its income tax returns with the same collector as did petitioners. *16 The principal business of the partnership during 1950 and 1951 was the purchase and sale of new and used trailers. Upon the sale of a trailer, it customarily received only a portion of the purchase price in cash or in credit for a used trailer. The customer would execute and deliver to the partnership an installment note, secured by a conditional sales contract, for the balance of the purchase price. The face amount of these notes included insurance premiums, interest and other charges computed to the maturity of the notes. During this period the partnership customarily transferred the installment notes and conditional sales contracts which secured them to either Minnehoma Financial Company of Tulsa, Oklahoma, hereafter called Minnehoma, or Commerce Union Bank of Nashville, Tennessee, hereafter called Commerce Union. In 1948, the partnership entered into a contract with Minnehoma providing the terms under which Minnehoma would accept installment notes. In 1949, this contract was amended by a letter from Minnehoma to the partnership which provided: "we are * * * establishing a dealer reserve. * * * "The finance charge rate is hereby increased to 6% per year. 1/6th of the finance *17 charge will be credited by us upon purchase of a contract to your reserve account. In addition we will withhold 5% of the unpaid balance of each contract we purchase from you and credit that to your reserve account. "In the future, you will have a reserve account against which we can charge delinquent payments and defaults instead of having to call upon you to pay or re-purchase the full amount. As your reserve account builds up we will give you reports on charges, credits and the balance. When the account exceeds 20% of the total of the balance of the paper outstanding we have purchased from you, the excess will be paid to you." On November 10, 1950, the partnership entered into a new contract with Minnehoma. This new contract remained in force, without change, through 1951 and provided: "4. Each contract shall require the purchaser to pay the total cash sale prices, plus the following: * * *
"(d) The finance * * * charge which shall be computed on the basis of 5% on new trailers and 6% on used trailers per year or such other rate as may be set by Minnehoma from time to time, of the cash selling price plus one year of the insurance premium, less the down payment made *18 * * * in cash or by trade-in allowance, for the time elapsing between the date of the contract and the date when the final installment shall become due; * * *
"6. The purchase price of each contract purchased by * * * Minnehoma * * * shall be * * * 95% of the aggregate of the retail cash sale price of the trailer-coach and all extra equipment and * * * [other expenses paid by the partnership] less the amount of the down payment made by the purchaser * * * "7. An amount to be determined by Minnehoma from time to time in its absolute discretion equal to not more than 5% of the aggregate of the retail cash sale price of the trailercoach and all extra equipment and * * * [other expenses paid by the partnership] less the amount of the down payment made by the purchaser * * * will be credited by Minnehoma to a special reserve account in the name of * * * [the partnership] which account will be referred to as the "Dealer Reserve Account." In addition, Minnehoma may credit to such Dealer Reserve Account * * *, but shall not be obligated so to do, * * * 1/10 on new trailers and * * * 1/12 on used trailers, or such other portions as Minnehoma may determine from time to time, of *19 the finance charge paid or agreed to be paid by the purchaser in each contract. * * * Minnehoma may, at its own option, charge against the Dealer Reserve Account any sums that the * * * [partnership] may at any time owe to Minnehoma in any connection whatsoever. In the event * * * the Dealer Reserve Account shall exceed 15% of the aggregate unpaid balances of all contracts purchased by and assigned to Minnehoma * * * [by the partnership] plus all contingent liabilities which * * * it may have with respect to such contracts, Minnehoma will pay such excess to * * * [the partnership] * * * [At] such time as all contracts * * * purchased and assigned to Minnehoma by the * * * [partnership] shall have been paid in full * * * and in the opinion of Minnehoma there shall be no contingent liability on the part of Minnehoma with relation thereto, Minnehoma shall pay to the * * * [partnership] the balance of the credit in such Dealer Reserve Account. * * * "8. [The partnership] * * * unconditionally guarantees the payment of all sums required to be paid under each contract purchased by and assigned to Minnehoma * * *" During 1950 and 1951, Minnehoma allowed the partnership *20 a portion of the finance charges. On its books it established accounts in the partnership's name, constituting dealer reserve accounts to which were credited the 5 per cent "holdbacks" and the partnership's share of the finance charges. A typical transaction between Minnehoma and the partnership during the years 1950 and 1951 may be illustrated as follows: Sales price of trailer
$4,500.00
Down payment or trade-in allowance
1,500.00
Balance due partnership
$3,000.00
Insurance for 1 year
90.00
$3,090.00
Interest on note for 48 months
($3,090.00 at 6% for 4 years)
741.60
$3,831.60
Insurance for remainder of term
270.00
Total amount of note
$4,101.60
Balance due partnership
$3,000.00
Holdback credited by Minnehoma to
account in name of partnership (5%
of $3,000)
150.00
Cash paid to partnership by Minne-
homa
$2,850.00
Partnership portion of finance charges
credited by Minnehoma to account in
name of partnership (1% per year
for 4 years) *
$ 123.60
During the years in question Commerce Union purchased installment notes from the partnership under the terms of an oral agreement. *21 An outline of this plan of operation was set forth in a letter from Commerce Union to the partnership, dated March 21, 1951, and was agreed to and acknowledged by petitioner Frank D. Wiley on behalf of the partnership. This letter provided: "No. 2. If any trailer contract becomes delinquent to the extent that it is deemed advisable to repossess the property, you shall have the responsibility of the physical conveyance of the trailer back to your premises after we have effected repossession of the trailer. You shall repurchase such contracts from us for the net unpaid balance at the time of repossession. * * * "No. 3. On trailer contracts where the term is longer than 36 months these transactions shall be with full recourse and you shall upon default of 3 or more installments agree to pay our net balance and effect repossession of the trailer. * * *
"No. 5. On all trailer contracts with a term exceeding 36 months we will hold back 5% of the unpaid balance as a deferred payment due you. This holdback is payable to you upon payment in full of each contract." The remainder of this letter set forth finance rates, required insurance coverage and the amount of finance charges Commerce *22 Union would credit to the partnership's dealer reserve account upon the purchase of a note, which credit was a percentage of the "unpaid balance" and varied in accordance with the term of the note and type of trailer sold. Commerce Union was to pay the partnership everything credited to the dealer reserve account in excess of 5 per cent of the partnership's contingent liability on all notes purchased from it by the bank. A typical transaction between Commerce Union and the partnership during the years 1950 and 1951 may be illustrated as follows: Sales price of trailer
$4,500.00
Down payment or trade-in allowance
1,500.00
Balance due partnership
$3,000.00
Insurance for 4 years
360.00
Interest on note for 4 years (6% of
$3,360 for 4 years)
806.40
Total amount of note
$4,166.40
Balance due partnership
$3,000.00
Holdback credited by Commerce Union
to account in name of partnership
(5% of $3,000)
150.00
Cash paid partnership by Commerce
Union
$2,850.00
Partnership portion of finance charges
credited by Commerce Union to part-
nership account (5% of $3,000)
$ 150.00
Minnehoma and Commerce Union credited the partnership accounts with a share of *23 the finance charges as each note was purchased. If the makers of the notes satisfied their obligations prior to maturity, they were relieved from paying some of the finance charges and Minnehoma and Commerce Union would debit the partnership accounts for a portion of the relieved charges. During 1950 and 1951, the partnership repurchased from Minnehoma and Commerce Union all defaulted notes and no losses were charged to the partnership's reserve. Both Minnehoma and Commerce Union notified the partnership periodically of the total amount of the partnership's share of finance charges which was held in the name of the partnership. The ultimate balance of these finance charge credits, after payment of all notes by the purchasers and payment of all amounts due by the partnership to Minnehoma and Commerce Union, was to be paid to the partnership. The partnership did not receive any cash payments during 1950 and 1951 for its share of the finance charges and was not entitled to any under its agreements. It received no interest on the amounts credited by Minnehoma and Commerce Union to its account and had no dominion or control over any part of these accounts. The partnership was not obligated *24 to sell and Minnehoma and Commerce Union were not obligated to purchase any trailer notes taken in by the partnership. The discounting of a note was a separate and distinct transaction between the partnership and the respective firm. Neither of these firms had anything to do with negotiations for the sale of trailers by the partnership. The partnership was allowed a share of the finance charges as a bonus or inducement for doing business with Minnehoma and Commerce Union. As of December 31, 1949, 1950 and 1951, the balances and yearly increases of the partnership share of finance charges on all trailer notes purchased from the partnership by Minnehoma and Commerce Union, which were credited by the firms to accounts in the name of the partnership, were in the following amounts: Balances
December
December
December
Year increase
Firm
31, 1949
31, 1950
31, 1951
1950
1951
Commerce Union
$5,623.55
$ 9,409.98
$38,338.56
$ 3,786.43
$28,928.58
Minnehoma
8,839.00
9,124.34
8,839.00
285.34
Total
$5,623.55
$18,248.98
$47,462.90
$12,625.43
$29,213.92
The partnership returns for 1950 and 1951 did not report any accruable income *25 relative to the accounts maintained in its name by Minnehoma and Commerce Union for the finance charge credits. Petitioners, in their individual joint returns for 1950 and 1951, reported only their distributive share of the income reported by the partnership. The yearly increase in credits in 1950 and 1951 to the partnership accounts by Minnehoma and Commerce Union, representing a portion of the finance charges on notes sold by the partnership, was taxable income to petitioners in 1950 and 1951, respectively. Opinion Petitioners contend that unlike Blaine Johnson, 25 T.C. 123, revd. (C.A. 4) 233 Fed. (2d) 952, the issue here does not involve a dealer's reserve composed solely of "holdbacks" by finance companies from the face amount of discounted paper representing the original selling price of trailers. Petitioners concede that portion of the present deficiency and contend merely that amounts similarly withheld by the finance companies out of the finance charges payable by the purchaser are not income to them until they are subject to immediate collection. While this issue may have been present in Blaine Johnson, supra, it was not then *26 separately discussed. It is, however, disposed of in our view in the case on which Blaine Johnson relied, Shoemaker-Nash, Inc., 41 B.T.A. 417. Even the Court which reversed Blaine Johnson would very possibly have found against petitioners in the present case. This appears from that Court's interpretation of Shoemaker-Nash, Inc., supra, in referring with approval to a quotation from Royal Motors, Inc., a Memorandum Opinion of the Tax Court [14 TCM 777]: "We pointed out, and the Circuit Court of Appeals for the Third Circuit in Keasbey and Mattison, supra, recognized the soundness of our view, that the amounts placed in the so-called reserve were not true reserves but were nothing more than part of a plan set up by the finance company to provide for payment to the dealer of a portion of the purchase price of the notes." Here also the portion of the finance charge which is in excess of the price of the trailer, and which forms the source of the reserves presently in controversy, is an accrued profit which petitioners are entitled to receive as a result of the sale of the notes, they having already been paid in full for the trailer itself. *27 What the present procedure in effect amounts to is that petitioners disposed of their trailer paper at a profit; that the amount due them for this profit was entered as such on the books of the finance companies, but that payment was withheld pending the final outcome of the transaction. In a comparable situation in Shoemaker-Nash, Inc., supra, we said (p. 423): "From the above it is, in our opinion, apparent that the sale of notes of automobile purchasers to the finance companies was as much a part of the business carried on by the petitioner as the sale of the automobiles themselves * * * and, the petitioner being on the accrual basis, we find nothing in this case to justify the conclusion that the profit from the sale of such notes is not accruable when the notes are sold. * * * For, although the amount of the reserve credit is not immediately paid and does not become immediately payable, there is no showing that it will not be collectible when due or that its collection in the future is improbable." If any part of the reserve fails of collection because the underlying paper proves to be uncollectible, "petitioner's compensation for that part will come by way of *28 a specific bad debt charge-off." [1]Blaine Johnson, supra, at 131. If, on the other hand, petitioners fail to collect because the notes are prepaid, deduction will presumably be allowed as for a loss. Charles G. Berwind, 8 T.C. 1112; Foundation Co., 14 T.C. 1333, 1353. That the percentage of finance charges which will ultimately fail of payment is now reasonably ascertainable is a conclusion we cannot reach on the present record.[2] A reserve to cover such contingencies even if one had been set up on petitioners' books would accordingly not be permissible. In a similar situation it was said: "The liability * * * arising from expected future cancellations was not deductible from gross income because it was not fixed and absolute. In respect to no particular policy written within the year could it be known that it would be canceled in a future year. Nor could it be known that a definite percentage of all the policies will be canceled in the future years. Experience taught that there is a strong probability that many of the policies written during the taxable year will be so canceled. * * *" [Brown v. Helvering, 291 U.S. 193, 201.] *29 *30 Any failure to collect the amounts which the finance companies recorded as owing to petitioners "would be the consequence of a condition subsequent." Arthur V. Morgan, 29 T.C. - (October 17, 1957). "Under these circumstances, we think the partnership's right to receive the net amount of the addition to the reserve during the taxable period became fixed, requiring its accrual by the partnership, under the principle of Spring City Foundry Co. v. Commissioner, 292 U.S. 182." Arthur V. Morgan, supra. See also Albert M. Brodsky, 27 T.C. 216. And if the reversal of Blaine Johnson, supra, is not distinguishable, we have in numerous instances since that time respectfully reverted to the position originally taken in the Tax Court opinion. Arthur V. Morgan, supra; Albert M. Brodsky, supra; Texas Trailercoach, Inc., 27 T.C. 575; West Pontiac, Inc., 27 T.C. 749; Charles M. Kilborn, 29 T.C. - (October 24, 1957). To enable computation of conceded adjustments, Decisions will be entered under Rule 50. Footnotes
*. On and after January 1, 1951, 1/2% per year for 4 years.↩
1. Although the issue is not present here, the theory upon which Blaine Johnson was decided appears to be equally applicable. The finance companies were entitled to charge against petitioners' reserves on their books any discounted paper which became uncollectible. This was by reason of petitioners' agreement to repurchase or, in effect, guarantee the payment of any defaulted paper. When they made good on this agreement, whether by cash payments or through debits to their account on the finance company's books, they again became the primary obligee of the trailer purchaser, and since the debt automatically became worthless at that time, they were entitled to charge if off. Shiman v. Commissioner, (C.A. 2) 60 Fed. (2d) 65, reversing 21 B.T.A. 288; Daniel Gimbel, 36 B.T.A. 539. It is true that in Johnson v. Commissioner, (C.A. 4) 233 Fed. (2d 952, 958↩, it was said to have been "conceded by the government at the hearing of this appeal that no deduction for these charges was taken by taxpayer in his income tax returns * * *." Whether or not this concession was justified, since the record and the findings in the Tax Court suggest no such evidence, is not of immediate present significance. The crucial proposition is that petitioners had the right to charge these amounts off whether or not they did so. Incidentally, in the case before us there is no evidence in this respect either way. 2. "The experience of prepayments and losses may, of course, also change in the future, making the amount ultimately received by the dealer more or less than the amount estimated at the hearing. Pet. br. p. 15.↩