**LONG POULTRY FARMS, Incorporated,**
**Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REV-**
**ENUE, Respondent.**

**No. 7458.**

United States Court of Appeals
Fourth Circuit.

Argued Oct. 15, 1957.

Decided Nov. 8, 1957.

Hugh C. Bickford and Mac Asbill, Jr.,
Washington, D. C., for petitioner.

Karl Schmeidler, Atty., Dept. of Jus-
tice, Washington, D. C. (Charles K. Rice,
Asst. Atty. Gen., and Lee A. Jackson,
Atty., Dept. of Justice, Washington, D.
C., on brief), for respondent.

Marion B. Plant and Hart H. Spiegel,
San Francisco, Cal., as amici curiae, and
Brobeck, Phleger & Harrison, San Fran-
cisco, Cal., of counsel.

Before PARKER, Chief Judge,
HAYNSWORTH, Circuit Judge, and
THOMPSON, District Judge.

PARKER, Chief Judge.

This is a petition to review a decision
of the Tax Court holding that a tax-
payer on the accrual basis must report
as taxable income a patronage refund
credit allotted to it by an agricultural
cooperative association. The taxpayer is
the Long Poultry Farms, Inc., a poultry
raiser of Newmarket, Virginia, which
had been selling poultry to Rockingham
Poultry Market, Inc., of Broadway, Vir-

ginia, in which taxpayer held eight shares of preferred stock. On April 1, 1953, the cooperative allotted a patronage credit of $6781.94 to taxpayer; and the question in the case is whether taxpayer, a corporation making its returns on the accrual basis, must account for this item as income for the fiscal year in which the allotment was made. The cooperative was an association exempt from taxation under the provisions of section 101(12) of the Internal Revenue Code of 1939, 26 U.S.C. § 101(12). The general plan under which it operated is thus described by the Tax Court:

"The general plan under which Rockingham operated was to provide centralized marketing facilities for its members and patrons, and at the end of each year to allocate to the members and patrons their proportionate share of the Cooperative's earnings. In order for it to maintain a revolving capital fund for its operation, the bylaws of the Cooperative provided that its members and patrons would currently furnish money for its capital through their patronage. The Cooperative, at the discretion of its directors, might retain all patronage refund credits, allocated to its members, for its use for so long as it wished. If the Cooperative sustained a loss in any year, the directors were authorized to reduce capital contributions or previous patronage refund credits on a proportionate basis. All debts of the Cooperative, both secured and unsecured, had priority over patronage refund credits. Such credits were not transferable."

The bylaws of the cooperative provided for a revolving capital fund to be evidenced by "revolving capital certificates and the amount to be evidenced by credits to patrons in the capital reserve accounts for that year." The bylaws further provided with respect to these:

"All such amounts shall have the same status as though they had been paid to the patrons in cash in pursuance of a legal obligation to do so

and the patrons had then furnished corresponding amounts for capital for the association. In the event the association suffers a loss in any year, the Board of Directors shall prescribe the basis on which the capital contributions of patrons shall be reduced on account of any such loss, so that it will be borne by the patrons on as equitable a basis as the Board of Directors finds practicable, but such losses shall first be charged against the capital reserve accounts. All capital furnished by deductions or otherwise under specific contracts with patrons shall be evidenced by revolving capital reserve accounts of the association, and such revolving capital certificates and credits shall be subject in all respects to the provisions of these bylaws regarding such certificates and credits. * * *

"Section 3. Revolving the Capital Fund. In order to further the cooperative character of this cooperative, the association shall revolve its capital (other than that evidenced by preferred stock and common stock carrying voting rights), however, it may be evidenced, from time to time, as funds are determined by the Board of Directors to be available for that purpose, but, except as herein provided, the capital that is retired in a given year, in whole or on a pro rata basis, shall be the oldest outstanding and unexhausted capital of the association. The directors shall pay off the Revolving Capital Certificates and capital reserve credits for the same year simultaneously · or consecutively.

\* \* \* \* \* \*

"Section 5. Losses. In the event the association suffers a loss in any year, the Board of Directors shall prescribe the basis on which the capital furnished by patrons shall be reduced on account of any such loss, so that it will be borne by the patrons on as equitable a basis as the Board of Directors finds practicable."

The evidence shows that in the ten year period between 1942 and 1952 the cooperative had built up $2,098,000 of these credits and had paid on them $8056.12, which represented the payment in 1945 of the credits for 1942. In 1952 it called $92,680 of the credits for the year 1943, which were then nine years old. At the time when taxpayer received his credit, therefore, the cooperative had paid only about 5% of the credits, and under the bylaws credits for nine years would have priority of payment over the credit allotted taxpayer.

On April 1, 1953, the cooperative wrote taxpayer a letter reading in part as follows:

"Based on the tonnage which you delivered as an individual grower to the plant during the year, you are entitled to a patronage refund credit of $6,781.94, which has been entered to the credit of your account as of this date. Please keep this letter for your own personal record, together with previous information sent to you, in order that your records will be complete. "This credit will be redeemed in cash at a *later date* and you will be notified when it is payable. *Do not present it for payment until you are notified.*"

The credit thus granted taxpayer was not saleable, had no market value and taxpayer was unable to borrow money on it although attempt was made to do so.

■ On these facts, as to which there is no dispute, we think it clear that taxpayer did not receive income as the result of the credit allotted, nor did it become entitled to receive anything which could properly be accrued as income. All that it received was a conditional credit on the books of the cooperative, a credit which was subject to diminution if the cooperative sustained losses, was subordinated to the payment of the cooperative's debts, was not to be paid until all prior holders of credits over a nine year period had been paid in full

and was to be paid only if and when the directors of the cooperative should so decide. It is argued that under implied agreement arising out of the provisions of the bylaws taxpayer in effect received in cash the amount of the credit and reinvested it in the revolving fund of the cooperative; but this is simply to exalt fiction and ignore reality. As said by this Court in Home Furniture Co. v. Com'r, 4 Cir., 168 F.2d 312, 313, "Economic realities, not legal formalities, determine tax consequences." The truth is that the taxpayer never received anything except a credit on the cooperative's books which did not entitle it to receive anything except upon the conditions above enumerated, and only then if the directors of the cooperative should so determine. As said by the Tax Court in Carpenter v. Com'r, 20 T.C. 603, 608, a case in which certificates had been issued by the cooperative for the credit and not, as here, a mere entry made on the cooperative's books:

"We have found that the certificates with which we are dealing had no fair market value. Accordingly, they would not be taxable to the petitioner. The Commissioner, however, brushes fair market value aside and seems to stand on the theory either of 'constructive receipt' or 'assignment of income', though at the same time stating that the theories on which he proceeds are immaterial. As in Phillips, so here, we do not think the Commissioner has advanced any sound reason for including any amount represented by the revolving fund certificates in the petitioner's income. The petitioner never had any real dominion or control over the funds represented by the certificates. The decision to retain the funds in the business rested solely with the directors. The certificates themselves had no fair market value and we do not see that whether or not the cooperative was obligated to issue such certificates

adds anything significant to the situation."

In affirming the decision of the Tax Court, the Court of Appeals of the Fifth Circuit in Commissioner of Internal Revenue v. Carpenter, 5 Cir., 219 F.2d 635, 636, used language which is appropriate here, saying:

"The respondent could control neither the amount of the funds that he would ultimately receive nor the time at which he might receive them. These matters were left to the discretion of the cooperative's directors, and even the directors could not pay off the certificates without written consent of the mortgagee. Therefore, the respondent never actually or constructively received or had any right to receive anything but the certificates."

See also Caswell's Estate v. Com'r, 9 Cir., 211 F.2d 693; Moe v. Earle 9 Cir., 226 F.2d 583, certiorari denied 350 U.S. 1013, 76 S.Ct. 657, 100 L.Ed. 873; William A. Joplin, Jr. v. Com'r, 17 T.C. 1526.

While in the cases cited, the taxpayers were reporting on the cash basis, we think the principles upon which the decisions are based would prevent the credits being taxed, as income if they had been on the accrual basis. North American Oil Co. v. Burnet, 286 U.S. 417, 423–424, 52 S.Ct. 613, 76 L.Ed. 1197. As said by the Tax Court in San Francisco Stevedoring Company v. Com'r, 8 T.C. 222, 225–226:

"A taxpayer, using an accrual method of accounting, must accrue an item in the year in which the taxpayer acquires a fixed and unconditional right to receive the amount, even though actual payment is to be deferred. *There must be no contingency or unreasonable uncertainty qualifying the payment or receipt.* Income does not accrue to a taxpayer using an accrual method until there arises in him a fixed or unconditional right to receive it. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347; Continental Tie & Lumber Co. v. United States, 286 U.S. 290, 52 S.Ct. 529, 76 L.Ed. 1111; Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 54 S.Ct. 644, 78 L.Ed. 1200; United States v. Safety Car Heating & Lighting Co., 297 U.S. 88, 56 S.Ct. 353, 80 L.Ed. 500; Putnam's Estate v. Commissioner, 324 U.S. 393, 65 S.Ct. 811, 89 L.Ed. 1023; H. Liebes & Co. v. Commissioner, 9 Cir., 90 F.2d 932; Mertens Law of Federal Income Taxation sec. 12.60." (Italics supplied.)

In Fountain City Coop. Creamery Association v. Com'r, 9 T.C. 1077, 1080, the Tax Court denied to a cooperative the right to accrue as a deduction an equity reserve out of which patrons' dividends were to be paid, saying: "* * * the patrons would have no method whatsoever of enforcing the payment of any amount on their certificates until the directors had taken a subsequent action." In affirming the Tax Court in that case, the Court of Appeals of the 7th Circuit, speaking through Judge, later Mr. Justice, Minton, used the following language (Fountain City Co-Op. Cr. Association v. Com'r, 7 Cir., 172 F.2d 666, 668):

"It is clear from the foregoing that instead of this patrons' equity reserve belonging to the patrons, it never left the control of the association which continued to treat it as its own. Its creation lay within the absolute discretion of the taxpayer's directors or stockholders and after creation, its continued existence was wholly at the will of the taxpayer's directors. This reserve never belonged to the patrons. It was and always remained the property of the taxpayer and was properly included by the Commissioner in the taxpayer's gross income."

To like effect is a case involving another cooperative where the taxpayer was making returns on the accrual basis and it was held that a patron's interest in a contingency reserve credited to patrons on the books of the cooperative was not

properly accruable as income of the patron. Farmers Grain Dealers Ass'n of Iowa v. Com'r, D.C., 116 F.Supp. 685, 688, appeal dismissed by consent 8 Cir., 214 F.2d 350. What was said by Judge Riley in that case is directly applicable here. Said he:

"The court must find that in this case there was never a time in 1947 (nor since, so far as the record reveals) when the amount of the distribution, to be made to plaintiff for any of the years involved, was ascertainable without a formal order of distribution by Indiana of reserves at a given time and in a given amount. Until determination as to amount of distribution had been made by the authority of Indiana, it would not be possible to ascertain or determine the amount to which plaintiff would be entitled, and hence it would not be possible to accrue an ascertainable amount as income. The conduct of the parties is consistent with no other finding.

"It is said in Security Flour Mills Co. v. Commissioner of Internal Revenue, 321 U.S. 281, 284, 64 S.Ct. 596, 597, 88 L.Ed. 725: 'It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent'. By the same token, he should not be compelled to accrue as income an amount which is unsettled or the availability of which to him is so highly contingent. The very nature of these reserves made them so and invested them with that uncertainty."

This is in accord with the well settled principles of accruing income for purposes of taxation which was laid down by this Court with the controlling authorities in the recent case of Johnson v. Com'r, 4 Cir., 233 F.2d 952, 956, in which we held that sums withheld by a finance company from amounts due taxpayer and credited to him on a reserve account were not taxable to him in the year in which they were credited until

the right to receive them became fixed, even though taxpayer was on the accrual basis. In that case, Judge Thomsen, speaking for the Court, said:

"The general principles which must control our decision have been authoritatively stated by the Supreme Court. It is 'the right to receive and not the actual receipt' of an amount which determines its accruability. 'When the right to receive an amount becomes fixed, the right accrues.' Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 185, 54 S.Ct. 644, 645, 78 L.Ed. 1200. Until the right to an amount becomes accruable through fixation of the right to receive, the taxpayer is under no obligation to return it as income. Otherwise, he would be required to pay a tax on income which he might never have a right to receive. North American Oil Consolidated v. Burnet, 286 U.S. 417, 423–424, 52 S.Ct. 613, 76 L.Ed. 1197.

"These principles have been applied by other courts and by this court to postpone the accruability of various types of reserves where the taxpayer's right to receive the money was dependent upon some contingency: Commissioner of Internal Revenue v. Cleveland Trinidad Paving Co., 6 Cir., 62 F.2d 85 (percentage of the contract price for street paving retained under contract provisions by municipalities to guarantee maintenance of the paving for a stipulated period); Keasbey & Mattison Co. v. U. S., 3 Cir., 141 F.2d 163 (reserve withheld by a finance company from an asbestos manufacturer which had guaranteed home owners' notes discounted by the finance company for applicators of the taxpayer's product); U. S. v. Fidelity & Deposit Co., 4 Cir., 177 F.2d 805; Id. 4 Cir., 178 F.2d 753 (reserves required by law to be set up against unearned premiums and losses on risks reinsured with another company not authorized to

do business within the state); and authorities cited in those opinions."

The cases upon which the Tax Court based its decision, Harbor Plywood Corporation, 14 T.C. 158, affirmed 9 Cir., 187 F.2d 734, and George Bradshaw, 14 T.C. 162 are distinguishable on the facts, in that they involved no such contingencies and uncertainties as are here involved. In one case, the only contingency related to renegotiation of a government contract. In the other, notes were issued and there was nothing to show that they were not worth face value. In both cases there was uncertainty as to when cash would be received on the promises of the cooperative but no contingency as to the right to receive or as to the amount.

■ The Commissioner places great weight on the argument that by 26 U.S.C. § 101(12) (B) an exempt cooperative is permitted to deduct from gross income patronage dividends such as are here involved and that there was testimony before committees of Congress to the effect that these would be returned for taxation by the recipients. The answer is that Congress while granting the right to the deduction by the cooperative left the matter of taxing the dividends to the recipients to be dealt with by existing law, making no change whatever with regard thereto, with the result that cash basis taxpayers will report as income patronage dividends such as are here involved in the year when payment thereof is received and accrual basis taxpayers will report them as income for the year in which the right to receive payment becomes reasonably definite and certain.

■■ The Commissioner relies upon a regulation that he has adopted which accords with his contention in this case (Treasury Regulations 118 sec. 39.22(a) 23); but to the extent that this regulation is contrary to existing law or attempts to tax as income what is not income under law, it is, of course, void and of no effect. To require the inclusion in income of contingent credits such as are here involved, would be to require the patrons of cooperatives to pay tax upon income which they have not received, over which they have been given no control and which they may never receive. Apart from the question of constitutionality of such a requirement, which would be a serious one, it is a safe assumption that Congress never intended to impose upon the patrons of cooperatives the hardship and burden which the taxability of these contingent credits would involve.

For the reasons stated, the decision of the Tax Court will be reversed and the case remanded for further proceedings.

Reversed.