**TEXAS TRAILERCOACH, Inc.,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

No. 16619.

United States Court of Appeals
Fifth Circuit.

Jan. 7, 1958.

Truxton Shaw, Wentworth T. Durant, Robert J. Hobby, Dallas, Tex., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack, Lee A. Jackson, Robert N. Anderson, Carolyn R. Just, Attys., Dept. of Justice, Nelson P. Rose, chief counsel, Internal Revenue Service, John M. Morawski, Sp. Atty., Washington, D. C., for respondent.

Before CAMERON, JONES, and WISDOM, Circuit Judges.

WISDOM, Circuit Judge.

This case is before us on a petition to review a decision of the Tax Court. The petition raises the problem of determining the tax effect of a dealer's reserve account.

The taxpayer, Texas Trailercoach, Inc., a Texas corporation organized July 1, 1952, with its main place of business in Dallas, Texas, sells new and used trailers, and is a dealer for Spartan Aircraft Trailercoach, Inc. The corporation reports income on an accrual basis. The tax in dispute is for the taxpayer's first fiscal year ending June 30, 1952. The tax claimed is $2,587.68 on $8,375.59 in the dealer reserve account on the books of Minnehoma Financial Company to the credit of the dealer.

I.

In financing installment sales, particularly of motor vehicles, finance companies make it a practice to hold back a certain portion of the price paid for a dealer's

installment paper or deferred payment contracts. The amount withheld is set aside in a "dealer's reserve" account, for protection against contingent losses from defaults. In our American economy, based so largely on consumer installment financing, dealers' reserve accounts perform a useful and often necessary function when the financing is furnished by a third party to a sale. A trailer dealer has little hope of obtaining financing unless he agrees to the establishment of a reserve account; its existence means life or death to the trailer business.

The practice raises a touchy tax question: Are amounts in a dealer's reserve account, held back by a finance company, taxable income to an accrual basis dealer in the year in which they are withheld and credited to the dealer's reserve account? Yes, says the Commissioner of Internal Revenue relying on Rev.Rul. 57-2, 1957-1 Int.Rev.Bull. 12. The Tax Court agreed with the Commissioner. We disagree. We respect the considered opinions of the Tax Court and of the Commissioner, but we think that the Court of Appeals for the Fourth Circuit stated the law correctly in Johnson v. Commissioner, 4 Cir., 1956, 233 F.2d 952, 957, holding that dealers' reserves are not taxable income until there is a fixed right to receive them. That is in the year in which they become payable to a dealer in accordance with his contract with the finance company. In the Johnson case and in this case the right of the taxpayer to receive the amounts in the dealer's reserve account was not fixed in the fiscal year when the amounts were withheld by the finance company.

## II.

Tax incidence should reflect the realities of a business transaction. Here, therefore, as in many tax cases, sometimes to the benefit of the government and sometimes to the benefit of the taxpayer, it is necessary to peel off the outer layers of a business transaction and get down to its core. It seems to us in this case that the Commissioner was fascinated by the form of the transaction and overlooked the substance. As courts have often said, and as the court said in Johnson: "Taxation is a practical matter; the substance of what is done and not the form must govern."

The Commissioner seems to see the problem as broken into two tight, closed sales: one, between the dealer and the trailer purchaser, with the finance company out of the picture; another, between the dealer and the finance company, with the trailer purchaser out of the picture.[1] Between the sales the dealer may

---

1. "Furthermore, the sale of the trailers by the taxpayer to individual purchasers and the sale of the contracts to the finance company were separate and distinct transactions. The finance company took no part in the sale of the trailers made by the taxpayer to the various purchasers." Commissioner's b., p. 17. The Commissioner argues, however, that it does not matter whether the sale of the trailer and the sale of the tractor are one or two transactions, for in either case the taxpayer receives the full sales price unless the purchaser defaults. Rev.Rul. 57-2 states, in part:

"The steps generally involved in transactions concerning automobile dealers are as follows: When a car is purchased on credit from a dealer, the purchaser makes a down payment, either in the form of cash or by turning in another car at an agreed value, the balance being satisfied by the purchaser's promissory note and a supporting conditional sales contract. The face amount of the note reflects two elements—the balance of what would be the purchase price of the car, if bought for cash, and a finance charge. As between the purchaser and the dealer, the transaction is closed and completed at this point with the attendant tax consequences to the dealer.

"It is then common practice for the dealer to sell or discount the purchaser's note and sales contract to some financial institution. The finance company or bank acquires the note at a value somewhat less than its face value, the difference representing a charge for its service. Simultaneously, either cash or unrestricted credit is given to the dealer to the extent of the amount reflected in the face value of the note. That corresponds to the unpaid balance of the cash retail price of the car. The difference between the face value of the note and the sum of the finance company's charge and its credit or immediate payment to the dealer (rep-

peddle the notes. When we get down to what actually happens, at least in this case, we find one transaction—a three-cornered agreement with interrelated obligations of dealer, purchaser, and finance company. Instead of being out of the first step of the transaction (the trailer sale to the purchaser), the finance company dictates the terms of the sale, has obligations running to it in the sales contract, has a fixed percentage for its finance charges worked into the sales price, and is as much a part of the substance of the business transaction as the dealer—whether or not it is the dealer who transfers the title formally to the purchaser, apparently for one hundred per cent of the purchase price. The hard core of the factual situation is that, under the three-way agreement, the dealer receives from the purchaser only a ninety-five per cent claim of right to the unpaid balance, plus a contingent claim, against the purchaser, to the remaining five per cent subject to a number of important conditions in favor of the finance company. The dealer transfers to the finance company, simultaneously, only what he receives from the purchaser. He receives from the finance company ninety-five per cent of the sales price plus a contingent claim, against the finance company, to the remaining five per cent then entirely under the dominion and control of the finance company. The dealer's claim to this five per cent may never become fixed or ascertainable; it may never be received. No payments from the reserve were made to the dealer or accruable until 1955 because of the intervening conditions established in favor of the finance company. There is no doubt that, from a lay or purely practical point of view, the five per cent did not become fixed or ascertainable and therefore accrue in the taxable year in question.

The Tax Court's position is: "Since the full sales price of the trailer is ac-

cruable at the time of the sale, the real question involved, we think, is not whether the amount in the Dealer Reserve Account is includible in income, but whether the amount in the Dealer Reserve Account is deductible from income." This seems to shut off the inquiry at the point where we would begin and raises a question of deductions that is not present in the case before us.

### III.

Selling a house trailer is not like selling a house. The mobility of trailers, the urge to move on of many trailer owners (migratory workers, travelers with a wanderlust, or just rovers), the relatively insecure financial status of a large number of trailer purchasers, the long credit extended (five and sometimes seven years as against two and a half years credit on automobile sales)—these and other elements of risk limit severely the market for trailer coach paper and give heavy bargaining leverage to financing institutions. As a result, finance companies exercise considerable control over a dealer's business practices and frequently participate in and police a dealer's sales.

The high risk, the advantage to trailer manufacturers of policed credit sales, and the dealer's difficulty in obtaining ordinary financing from established institutions impel some trailer manufacturers to set up their own finance companies. One such company is the Minnehoma Financial Company of Tulsa, Oklahoma, organized to finance sales of Spartan Aircraft trailers. Minnehoma was the finance company involved in Johnson. It is the finance company involved in this case.

As a dealer for Spartan Aircraft trailers, Texas Trailercoach, Inc. entered into a contract with Minnehoma July 10, 1952. The taxpayer was unable to make any other financing arrangements during the year in question.

resenting part of the finance charge previously mentioned) is then credited on the books of the finance company as a liability of the finance company to the

dealer. The accumulation of these credits is generally known as a 'dealers reserve' and is the specific object of the present consideration." Rev.Rul. 57–2.

An examination of the agreement between Texas Trailercoach, Inc. and Minnehoma shows that the agreement wraps in one tight package the dealer's sale of a trailer to the purchaser and the dealer's sale of the trailer contract to the finance company. The agreement orbits around two central purposes: (1) Minnehoma's intention to control the trailer sales and (2) Minnehoma's intention to have discretionary authority over the dealer's reserve account in which Texas Trailercoach, Inc. shall have only a restricted contingent interest, subordinate to certain conditions in favor of Minnehoma.

The agreement provides that Minnehoma will finance only Spartan Aircraft trailers. The trailer purchaser must complete a credit form supplied by Minnehoma; the dealer forwards this and two copies of a Dun and Bradstreet or Retail Merchants Credit Report to Minnehoma. Each trailer contract must be on a printed form provided by Minnehoma. The blank form in the record shows in large type "Minnehoma Financial Company—Tulsa, Oklahoma—Conditional Sale Contract." Both the financing agreement and the trailer sale contract provide that the balance owed by the purchaser is payable at the Minnehoma office in Tulsa, Oklahoma. No payments are to be made to the dealer, except of course the down payment. Any other payments the dealer receives are held in trust for Minnehoma and must be forwarded immediately to Minnehoma. Minnehoma designates the amount of the down payment. The purchaser may sign only one trailer purchase contract, and this contract must be delivered to Minnehoma. The dealer's assignment and guarantee to Minnehoma is on the face of the trailer sales contract. Minnehoma has the right to make extensions or renewals of any payment. Minnehoma has the right to pursue collection efforts and to repossess trailers on delinquent accounts, or to call upon the dealer to do so, all expenses to be borne by the dealer. The trailer contract includes an unconditional guarantee by the dealer against any losses by Minnehoma, including loss of prospective profits. The purchaser executes no notes in favor of the dealer and no evidence of the sale is obtained except the original trailer contract forwarded to the finance company.

After deduction of the down payment in cash or by trade-in allowance, two elements make up the amount the purchaser pays: (1) the selling price of the trailer and (2) a finance charge, usually five per cent on new trailers and six per cent on used trailers per year on the selling price less the down payment.[2] The agreement between the Texas Trailercoach, Inc. and Minnehoma requires a trailer contract that the purchaser pay in monthly installments over a period of not more than sixty months for new trailers and thirty-six to sixty months for used trailers, the exact period depending on the model. The "purchase price of each [trailer] contract purchased by and assigned to Minnehoma" is ninety-five per cent of the unpaid cost of the trailer. In addition, Minnehoma agrees to reimburse the dealer for sales taxes, extras, filing and recording fees.

The holdback provision of the agreement provides that "an amount to be determined by Minnehoma from time to time in its absolute discretion equal to not more than five per cent * * * will be credited by Minnehoma to a special reserve account in the name of the Dealer".[3] No payments are to be made

---

2. "The total amount due under the contract must be the aggregate of: (1) the cost of the trailer, (2) all taxes imposed on the sale, (3) the price of all extra equipment, (4) all filing and recording fees, (5) insurance against fire, theft, and collision, (6) a finance charge of 5% per annum on new trailers and 6% per annum on used trailers, computed on the unpaid cash sales price, plus one year's insurance premium."

3. " * * * "7. An amount to be determined by Minnehoma from time to time in its absolute discretion equal to not more than 5% of the aggregate of the retail cash sale price of the trailer coach and all extra equipment and all sums paid by the Dealer as required hereunder for sales and other taxes, extras and filing and recording fees less the amount of the down payment made by the purchaser in cash and/or by trade-in allow-

to the dealer from the reserve account until the total in the account exceeds fifteen per cent of the aggregate unpaid amounts on all of the trailer contracts, plus an amount adequate to satisfy any contingent liability which Minnehoma in its absolute discretion might determine to be due on such contracts. There is a catch here. The excess amounts are payable only *"from time to time as determined by Minnehoma"*.

In addition to the holdbacks in the reserve, Minnehoma may be credited with a bonus, but this is purely a matter of grace and Minnehoma is under no obligation to give the bonus. It is subject of course to the same conditions as the

holdback, once it is credited to the dealer's reserve account.[4]

In addition to the uncertainty created by Minnehoma's discretionary authority to withhold amounts adequate to satisfy any contingent liability, the contract sets forth other conditions which cumulatively, if not separately, make the dealer's claim to the reserve contingent or unfixed. "Minnehoma may, *at its own option, charge against the Dealer Reserve Account any sums that the Dealer may at any time owe to Minnehoma in any connection whatsoever.*" Under this provision, Minnehoma conceivably might charge against the account tort claims, fanciful breach of contract claims, claims

ance will be credited by Minnehoma to a special reserve account in the name of the Dealer hereunder as to each contract purchased by and assigned to Minnehoma hereunder, which account will be referred to as the 'Dealer Reserve Account.' In addition, Minnehoma may credit to such Dealer Reserve Account hereunder, but shall not be obligated so to do, one-tenth (1/10) on new trailers and one-twelfth (1/12) on used trailers, or such other portions as Minnehoma may determine from time to time, of the finance charge paid or agreed to be paid by the purchaser in each contract. In addition to and without affecting any or all of its rights hereunder, Minnehoma may, at its option, charge against the Dealer Reserve Account any sums that the Dealer may at any time owe to Minnehoma in any connection whatsoever. In the event and at such time or times as the Dealer Reserve Account shall exceed 15% of the aggregate unpaid balances of all contracts purchased by and assigned to Minnehoma hereunder by the Dealer plus all contingent liabilities which, on the sole determination of Minnehoma, it may have with respect to such contracts, Minnehoma will pay such excess to the Dealer from time to time as determined by Minnehoma but not more frequently than once each month. In the event that and at such time as all contracts as shall have been purchased and assigned to Minnehoma by the Dealer shall have been paid in full and no sums shall remain unpaid thereunder and in the opinion of Minnehoma there shall be no contingent liability on the part of Minnehoma with relation thereto, Minnehoma shall pay to the Dealer the balance of the credit in such Dealer Reserve Account.

Minnehoma's determination as to the possibility of contingent liability shall be final and not subject to question by the Dealer.

"8. The Dealer unconditionally guarantees the payment of all sums required to be paid under each contract purchased by and assigned to Minnehoma hereunder when such payment shall become due. In the event that the purchaser defaults or fails to pay any installment due under any contract purchased by and assigned to Minnehoma hereunder, the Dealer agrees on demand of Minnehoma to pay such sum then due or, upon request of Minnehoma, to repurchase the contract from Minnehoma for the amount of the entire balance remaining unpaid. Anything herein to the contrary notwithstanding, the Dealer may at its election at any time repurchase from Minnehoma any contract theretofore sold and assigned to Minnehoma upon payment of the entire balance remaining unpaid under said contract. In the event of such repurchase and the payment of the repurchase price by the Dealer, Minnehoma shall assign to the Dealer any and all rights it may have in and to such contract. The Dealer also guarantees full and faithful performance by the purchaser in any and all terms of the contract in addition to payment, and agrees that at the election of Minnehoma, upon default by the purchaser in any of the terms and conditions of such agreement, the Dealer will forthwith repurchase from Minnehoma such contract as to which the purchaser shall have defaulted and shall pay to Minnehoma the entire amount unpaid under said contract." "

4. See footnote 3.

having no connection with the specific amounts in the dealer reserve account on which a tax is sought—claims for which Texas Trailercoach, Inc. might or might not be liable. Moreover, even when all the trailer contracts have been paid in full, Minnehoma may still withhold turning over to the dealer the amount in the reserve account until *"in the opinion of Minnehoma there shall be no contingent liability on the part of Minnehoma with relation thereto"*, that is, on the trailer contracts. *"Minnehoma's determination as to the possibility of contingent liability shall be final* and not subject to question by the dealer."

Finally, the dealer unconditionally guarantees the payment of the entire amount on each trailer contract, presumably including sums due on contracts the terms of which may be extended and altered by the finance company. On a trailer purchaser's default, the dealer agrees to pay the sum due or, upon Minnehoma's demand, to repurchase the contract for the entire amount unpaid under the contract. Since the unconditional guaranty includes the five per cent reserved, insurance premiums for the full term, and the finance charge for the full term, the dealer guarantees the finance company against all loss, including loss of anticipated profits. In a typical transaction [5] the dealer guarantees considerably more to the finance company than is withheld in the reserve on the sale. In the typical transaction noted in the margin the dealer guarantees payment of the finance charge of $950.76 and the insurance premiums of $317.50 as against $173.29 credited to the reserve account.

In recording the details of a transaction, the dealer credits ninety-five per cent of the unpaid selling price to a sales account. The remaining five per cent is credited to a "Repossession Reserve Deferred Income" account. The sales account is closed to profit and loss at the end of the year and the balance in that account is reflected in income. The repossession reserve deferred income account is not reflected in the computation

5. The stipulation sets out the mechanics of a typical transaction:

"Dealer makes a sale of a trailer with an invoice price of $4,295.00 plus additional equipment with an invoice price of $223.56 plus a sales tax of $47.25, making a total invoice price of $4,565.81. The dealer receives a down payment in the amount of $1,100 00 represented by cash in the amount of $700.00 and the trade-in of a boat in the amount of $400.00, leaving a balance due in the amount of $3,465.81. To this amount is added insurance premiums of $317.50, registration and recording fee of $19.74, and finance charges of $950.76 making the contract balance owed by the purchaser $4,753.81. A copy of the actual contract upon which this typical transaction is based is attached hereto as Exhibit 4D.

"The 'Dealer Reserve Account' will be determined to be five per cent of $3,465.-81 or $173.29. The dealer will make a credit to the Sales Account in the amount of $4,121.71, which represents the invoice price of $4,295.00 for the trailer less the 'Dealer Reserve Account' in the amount of $173.29. In recording the transaction petitioner makes the following journal entries at the time of the sale:

|  | Dr. | Cr. |
| --- | --- | --- |
| Contracts in Transit | $ 3,312 26 | |
| Cash (from purchaser) | 700.00 | |
| Boat (trade-in) | 400.00 | |
| Sales (Trailer) | | $ 4,121.71 |
| Sales (Extra Equipment) | | 223.56 |
| Due for Sales Tax, License | | 66.99 |

"When the petitioner receives payment from Minnehoma Financial Co. a journal entry is made to record the payment thusly:

|  | Dr. | Cr. |
| --- | --- | --- |
| Cash (received from Financial Co.) | $ 3,312.26 | |
| Contracts in transit | | 3,312.26 |
| Repossession Reserve | 173.29 | |
| Deferred Income | | 173.29" |

of net income; it is carried on the balance sheet as "Contingents Assets". Here, the dealer received nothing from the reserve account until 1955. When the payments were received from the reserve account, the payments were treated as income in accordance with the dealer's accounting theory of the reserves. Accountants for the taxpayer testified that this accounting was consistent with the accrual method. The finance company placed the whole finance charge in an unearned income account and transferred it to income over the life of the contract as it was earned. No separate bank account was earmarked by Minnehoma as belonging to Texas Trailercoach, Inc.

## IV.

█ The basic principles controlling accrual of income for tax purposes stem from North American Oil Consolidated v. Commissioner, 1932, 286 U.S. 417, 52 S.Ct. 613, 615, 76 L.Ed. 1197 and Spring City Foundry Co. v. Commissioner, 1934, 292 U.S. 182, 54 S.Ct. 644, 645, 78 L.Ed. 1200. In the first case the Supreme Court held that the taxpayer did not receive certain net profits in 1916, "because at no time during the year was there a right" to receive; "throughout 1916 it was uncertain who would be declared entitled to the profits". In Spring City Foundry Co. v. Commissioner the Court laid down the doctrine now deeply rooted in federal tax law: "It is the right to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues."

This Court has applied these principles on several occasions. Commissioner v. Edwards Drilling Co 5 Cir., 1938, 95 F.2d 719, 720, involved drilling payments to a contractor on an accrual basis. It was a strong case from the taxpayer's point of view, because he was to receive a certain amount from oil production and there was, naturally, uncertainty, as to whether any oil would be produced. The Court held that the drilling payments were not taxable until received: "It is

of course true, as the Board points out, that under the accrual method of accounting employed by petitioner, items must be accrued as income when the events occur to fix the amount due and determine liability to pay. United States v. Anderson, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347. Generally speaking, however, the income tax law is concerned, and its administration should deal only, with, realized losses, and realized gains. Lucas v. American Code Co., 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538. The taxpayer therefore, is under no obligation to pay a tax on income he might never receive. North American Oil Consolidated v. Burnet, 286 U.S. 417, 52 S.Ct. 613, 76 L.Ed. 1197. A strained construction in administrative efforts to accrue income, should be avoided." More recently, in Commissioner v. Carpenter, 5 Cir., 1955, 219 F.2d 635, 636, this Court held: "The respondent could control neither the amount of the funds that he would ultimately receive nor the time at which he might receive them. These matters were left to the discretion of the cooperative's directors, and even the directors could not pay off the certificates without written consent of the mortgagee. Therefore, the respondent never actually or constructively received or had any right to receive anything but the certificates." See also Frost Lumber Industries, Inc. v. Commissioner, 5 Cir., 1942, 128 F.2d 693, and Raymond Pearson Motor Co. v. Commissioner, 5 Cir., 1957, 246 F.2d 509.

Keasbey & Mattison Co. v. United States, 3 Cir., 1944, 141 F.2d 163, 167, involved reserves withheld by a finance company. In that case the taxpayer, an asbestos manufacturer, sold its products to dealers who then sold to retailers or "applicators", who in turn sold to homeowners. The taxpayer contracted with a finance company "to discount, for applicators", notes of the homeowners who had purchased the manufacturer's products. The notes were guaranteed by the manufacturer. The finance company withheld reserves as protection against contingent losses. The Commissioner at-

tempts to distinguish this case on the ground that the finance company was merely discounting notes for the "applicators", but as the Court said:

"Applying the foregoing principles to the facts of the instant case, it follows that no part of the reserve fund was accruable as an asset to the plaintiff during the taxable year. Certainly nothing was payable to the plaintiff by way of reserve excess, for there was none. At no time was the reserve much more than half the amount of ten percent of the notes discounted by the Finance Company (the amount of reserve necessary before there could be any excess payable to the plaintiff). And, as to what was actually in the reserve, the plaintiff's right thereto was subject to the payment therefrom of all notes, discounted by the Finance Company, which should become delinquent for a period of sixty days or more, and all charges due the Finance Company. Whether the plaintiff would ever acquire a fixed right to receive anything from the reserve fund was contingent and unascertainable throughout the taxable year."

The Commissioner and the Tax Court rely on Shoemaker-Nash, Inc., v. Commissioner, 1940, 41 B.T.A. 417 and on Johnson, 1955, 25 T.C. 123 (notwithstanding the reversal of the Tax Court holding). In Shoemaker-Nash an automobile dealer on an accrual basis sold installment paper to a finance company that retained a portion of the original price of the notes and credited it to the dealer on its books in a reserve account. The Board of Tax Appeals held that the taxpayer should report as income all amounts credited to the reserve accounts each year even though nothing was released from the accounts during the year. In the Johnson opinion the Court recognized Shoemaker-Nash as "the leading case in the Tax Court",[6] but stated that "the direction in which it leads is doubtful". Judge Thomsen attributed the "Janus-like character of Shoemaker-Nash" to sketchy facts, "so that the courts had to infer certain facts from the notice of deficiency." In Royal Motors, Inc. v. Commissioner, decided July 12, 1945, 4 TCM 777, CCH Dec. 14,687 (M), the Tax Court itself said that "the so-called reserves [in Shoemaker-Nash] were not true reserves." In Keasbey & Mattison v. Commissioner, the Court pointed out: "The so-called 'reserve' in the Shoemaker-Nash and the Colorado Motor Car cases was really not a reserve against possible losses. There was nothing in the contract in either of those cases, so far as the Board's findings of fact disclose, to indicate that the respective finance companies had the right to charge uncollectible notes to the 'reserve' account. The 'reserve' was in reality nothing more than a plan set up by the finance companies to provide for payment to the taxpayers (automobile dealers) of a portion

---

6. See Hansen v. Commissioner, decided June 28, 1957, 1957 P–H T.C. Memorandum Decisions, par. 57,113, 16 TCM 471, CCH Dec. 22,454 (M), CCH T.C. Memo. 1957–113; Glover v. Commissioner, decided March 18, 1957, 1957 P–H T.C. Memorandum Decisions, par. 57,045, 16 TCM 203, CCH Dec. 22,292 (M), CCH T.C. Memo. 1957–45; West Pontiac, Inc., v. Commissioner, 27 T.C. 749, now pending on appeal to this Court, CCH Dec. 22,235; Brodsky v. Commissioner, 27 T.C. 216, CCH Dec. 22,000; Wm. Koch Motors, Inc. v. Commissioner, decided December 30, 1955, 1955 P–H T.C. Memorandum Decisions, par. 55,334, 14 TCM 1322, CCH Dec. 21,495 (M), T.C. Memo. 1955–334; Central Motors, Inc. v. Commissioner, decided August 12, 1954, 1954 P–H T.C. Memorandum Decisions, par. 54,228, 13 TCM 781, CCH Dec. 20,502 (M), CCH T.C. Memo. 1954–122; Ray Woods Used Cars, Inc., v. Commissioner, decided September 30, 1952, 1952 P–H T.C. Memorandum Decisions, par. 52,290, 11 TCM 983, CCH Dec. 19,229 (M); Town Motors, Inc., v. Commissioner, decided July 24, 1946, 1946 P–H T.C. Memorandum Decisions, par. 46,173, 5 TCM 625, CCH Dec. 15,304 (M); Royal Motors, Inc. v. Commissioner, decided July 12, 1945, 1945 P–H T.C. Memorandum Decisions, par. 45,255, 4 TCM 777, CCH Dec. 14,687 (M); Colorado Motor Car Co. v. Commissioner, decided March 25, 1940, 1940 P–H T.C. Memorandum Decisions, par. 40,178.

of the purchase price of the notes." [141 F.2d 167.] See also Beaudry v. Commissioner, 1941, 43 B.T.A. 1209.

In Johnson v. Commissioner, the factual situation is almost identical with the factual situation here. As in this case, the taxpayer was a trailer dealer, the finance company was Minnehoma. There was an agreement between Blaine Johnson and Minnehoma similar to the agreement between Texas Trailercoach and Minnehoma. In both cases the finance company credited reserves (holdbacks and a bonus) on its books to the credit of the dealer. The only difference in the facts was that the dealer in the Blaine Johnson case obtained notes from the trailer purchasers and transferred these to the finance company; here, the dealer received no notes and transferred the trailer purchase contracts. Speaking for the Court, Judge Thomsen held:[7]

"In the case at bar, as well as in Beaudry and in Keasbey & Mattison, the reserves were always less than the maximum prescribed by the agreements, so that there was no reserve excess payable to the taxpayer. And in each case the reserve fund was subject to the payment of all notes discounted by the finance company. As the court said in Keasbey & Mattison: [141 F.2d 167] 'Whether the plaintiff [taxpayer] would ever acquire a fixed right to receive anything from the reserve fund was contingent and unascertainable throughout the taxable year.'"

The Commissioner makes no attempt, nor could he, to distinguish Johnson v. Commissioner. His position and that of the Tax Court is that the Fourth Circuit was wrong, perhaps because Rev.Rul. 57–2 had not been issued at the time the case was decided. The issuance of Rev. Rul. 57–2 prior to the decision, would have had no effect on the court, as is evident from a decision handed down November 8, 1957. In Long Poultry Farms, Inc., v. Commissioner, 4 Cir., 1957, 249 F.2d 726, the Fourth Circuit reaffirmed the principles stated in Johnson and applied them to reserves held by a farm marketing cooperative. In that case a taxpayer on an accrual basis had not included in its taxable income a patronage refund credit allotted it by an agricultural cooperative association and retained as a reserve. Judge Parker quoted extensively from Johnson and held that the patronage refund credit was not includible because it was "a contingent credit".

The closer a tax comes to giving effect to the economic realities, the more bearable it is as the price of national security and of civilization.[8] The real trouble in this case is that the taxpayer is asked to pay a tax on money he did not in fact receive and had no right to receive during the taxable year in question.[9] He may never receive it, but he is asked to deplete his cash in order to pay it. If

---

7. The Court also said: "In the case at bar the Commissioner argues that the sale of a trailer and the sale of the notes resulting therefrom were separate and distinct transactions. Such an argument, however, ignores the realities. Before a trailer was sold, taxpayer knew which company was going to finance the transaction. The note and the chattel mortgage were executed on printed forms provided by the particular finance company which was going to discount the note. These forms called for monthly payments to be made at the principal office of the finance company in Tulsa, Oklahoma, Grand Rapids, Michigan, etc. None called for any payments to be made to taxpayer in Charleston, South Carolina. The pattern of each sale was a single transaction from the time the trailer was sold through the time the note was discounted by the particular finance company on whose forms it was executed. * * *" Johnson v. Commissioner, 4 Cir., 1956, 233 F.2d 957.

8. "Taxes are what we pay for civilized society," Mr. Justice Holmes said in Compania General de Tabacos de Filipinas v. Collector of Internal Revenue, 1927, 275 U.S. 87,100, 48 S.Ct. 100, 105, 72 L.Ed. 177.

9. "* * * To require the inclusion in income of contingent credits such as are here involved, would be to require the patrons of cooperatives to pay tax upon income which they have not received, over which they have been given no control and which they may never receive. * * *" Long Poultry Farms, Inc., v. Commissioner, 4 Cir., 1957, 249 F.2d 726, 731.

compelled to pay, the more business he does—the worse off his cash position will be. But, if a more realistic view is taken, the Government will not be deprived of any tax, because when the contingent credit materializes as a fixed, ascertainable claim or if payments are received from the reserve account, the taxpayer must then include the fixed claim or payments in his taxable income.

It may well be, in another case, that a dealer's sale of a trailer to an individual purchaser may be a complete and separate transaction; that, thereafter, the dealer may discount the purchaser's note or sell the purchase contract to a bank or finance company in a distinct and separate transaction; and, that, because of no intervening conditions or few restrictions on the dealer's reserve, amounts in a dealer's reserve account may be accruable to the dealer when withheld. Here, however, the financing agreement between Texas Trailercoach, Inc. and Minnehoma made the trailer sale and its financing one transaction. Minnehoma played a vital part in the transaction from the incipiency of each trailer sale. Minnehoma controlled each sale, passed on the credit risk, furnished the printed form, dictated the terms of each trailer sale, and was specifically designated as the party to receive the unpaid balance. As far as the trailer purchaser knew or cared about the transaction, his dealings were with Minnehoma from the moment the sale was executed. In a real sense Minnehoma extended its credit to the trailer purchasers, and purchased the trailer contracts *for the trailer purchasers,* at least to the same extent that Bancredit Corporation "merely discounted notes for applicators" in Keasbey & Mattison v. Commissioner.

The practical effect of Minnehoma being a party to the transaction from the beginning, is that the taxpayer did *not* receive the full sales price or its equivalent from the purchaser. Minnehoma stepped in and exercised dominion and control over five per cent. The Commissioner is mistaken in saying that the tax-

payer in any event receives the full sales price and that the only risk is the risk in every credit sale that the trailer purchaser may default. Here, the taxpayer runs the risk that Minnehoma, exercising complete discretionary control over the reserve account, "at its option", may charge against the account amounts *Minnehoma decides* that the dealer may at any time owe in *"any connection whatsoever"*, a determination that is not subject to question by the dealer.

The dealer does not have a fixed, ascertainable claim to the reserve at the time of the sale or holdback; he has a claim for some time in the future—provided the aggregate of the amounts in the account exceed fifteen per cent on the balance due on all contracts. The account may never exceed fifteen per cent. In this case the dealer waited three years to receive any payments from the reserve account.[10] Thus, the dealer's right to receive payments from a particular sale to a trailer purchaser depends upon not only that purchaser not defaulting but upon other purchasers not defaulting. It depends, ultimately, upon the level of the taxpayer's business, and perhaps the level of business generally, (1) being sufficiently high for the reserve to build up to more than fifteen per cent of the unpaid balance on all trailer contracts and, thereafter, (2) not declining sufficiently for the defaults of all trailer purchasers to cut into the reserve so as to reduce the account below fifteen per cent of the unpaid balance due on all contracts. The dealer may then receive the excess above the fifteen per cent—but only at the discretion of the finance company that may, if it choose, dream up some liability of the dealer, "in any connection whatever", to charge against the account.

### V.

This case shakes down to a few basic facts. In each credit sale of a trailer, the obligations of the purchaser, dealer, and finance company were inextricably interwoven in a single three-party agreement. The agreement gave the finance company

---

10. The dealer received $2,466.53 in May, 1955. In 1956 the dealer received $417.- 24 in October, $239.28 in November, and $847.23 in December.

virtually complete control over five per-cent of the unpaid purchase price. The finance company exercised its control by withholding this five per cent in a special dealer's reserve account surrounded by various conditions precedent to payment. These conditions were contingencies which might have barred indefinitely the dealer's receipt of payments or the right to receive payments from the account. One of these contingencies, the proviso that the account exceed fifteen per cent of the unpaid balance on all trailer con-tracts, effectively barred the dealer from receiving or having the right to receive any amounts from the reserve account until nearly the end of the third year of the dealer's corporate existence. We hold, therefore, without generalizing be-yond the logical necessities inherent in the facts of this case, that the amounts in this dealer's reserve account were con-tingent credits. They did not accrue in the taxable year when the finance com-pany withheld the amounts and credited them on its books to the taxpayer.

The decision of the Tax Court is re-versed and remanded for further pro-ceedings.

Reversed and remanded.