**PRICE MOTORS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 1232.**

United States District Court
E. D. Tennessee
Northeastern Division.

Oct. 10, 1958.

———◆———

W. J. Barron, Morristown, Tenn., Bruce Moody, Knoxville, Tenn., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, David A. Wilson, Jr., Washington, D. C., John J. Kilgariff, Attys., Dept. of Justice, Alexandria, Va., John C. Crawford, Jr., U. S. Atty., John F. Dugger, Asst. U. S. Atty., Knoxville, Tenn., for defendant.

VAUGHT, District Judge.

This is an action to recover $2,469.50, plus interest, paid under protest to the District Director of Internal Revenue at Nashville, Tennessee, on March 26, 1956, for which a claim for refund was disallowed on July 2, 1957.

The case was submitted to the court upon the agreed stipulation of facts and briefs. The facts as stipulated are as follows:

"1. Price Motors, Inc., plaintiff herein, was incorporated on November 2, 1953, under laws of the State of Ten-

nessee, with its principal place of business in Morristown, Tennessee. Plaintiff is a General Motors authorized Pontiac-Cadillac automobile dealer and keeps its books and prepares its income tax returns on the accrual method of accounting. Its Federal Income Tax Return for the tax year November 2, 1953, to June 30, 1954, was timely filed with the Director of Internal Revenue, Nashville, Tennessee, and the tax shown thereon timely paid.

"2. During the tax year ending June 30, 1954, plaintiff sold automobile paper to General Motors Acceptance Corporation, hereinafter referred to as GMAC, and the amount of income and excess profit taxes paid on $6,218.00 held in a dealer's reserve account by GMAC in the name of Price Motors, Inc., which is the item here in controversy.

"3. The typical transaction involving the dealer's reserve account is as follows:

"(a) Price Motors, Inc., in selling an automobile, either new or old, would negotiate with the purchaser with reference to the sale price, down payment, trade in, insurance and the terms of payment. If the purchaser desired to defer payment or make payments in installments, Price Motors, Inc., would then decide whether it would finance the transaction, sell it to GMAC, or finance it in some other manner.

"(b) If Price Motors, Inc., decided to finance the sale it would use its own conditional sales contract which included cash sale delivery price, down payment, trade in, amount of required car insurance, and finance charges. On sales financed by Price Motors, Inc., it would include the full sale price, the amount of the insurance premium that it was entitled to, and the full finance charges as income on its books and records.

"(c) If Price Motors, Inc., decided that they would not finance the sale but would sell the conditional sales contract to GMAC, it would notify GMAC of the name of the purchaser and terms of sale. If GMAC approved the credit of purchaser and terms of the conditional sales contract the conditional sales contract would be drawn up between the purchaser and Price Motors, Inc., using its rate manual to determine the finance charges, on a form furnished by GMAC. A copy of said Conditional Sales Contract is attached hereto and made a part of this stipulation. After the purchaser signed the conditional sales contract, Price Motors, Inc., would forward the contract to GMAC and would carry the conditional sales contract in its notes receivable—in transit account on its books and records until such time as GMAC processed the contract and made remittance to Price Motors, Inc., of all amounts except finance and service charges. Upon acceptance of the conditional sales contract GMAC voluntarily recorded in a dealer's reserve account in the name of Price Motors, Inc., a percent of the finance charges as an inducement to obtain additional conditional sales contracts and to protect it against losses. When the reserve thus created exceeds 5% of the total conditional sales contracts of Price Motors, Inc., outstanding at any time, which are unconditionally guaranteed by Price Motors, Inc., such excess is made available to Price Motors, Inc., and is at that time recorded on the books of Price Motors, Inc., as income. During the tax year ending June 30, 1954, the dealer's reserve account in the name of Price Motors, Inc., thus created at no time equaled or exceeded five percent of the outstanding conditional sales contracts of Price Motors, Inc., and did not exceed five percent until June 30, 1955. The amount in the dealer's reserve account in the name of Price Motors, Inc., not exceeding five percent of the outstanding conditional sales contracts of Price Motors, Inc., was held by GMAC to be used to off-set any obligations of Price Motors, Inc., which resulted from defaults, repossessions, exceptional collection charges and other subsequent intervening conditions established in favor of GMAC, and Price Motors, Inc., would not be entitled to payment of the amount in said dealer's reserve account until the full amount of

outstanding conditional sales contracts of Price Motors, Inc., had been fully paid by the automobile purchasers. GMAC made monthly statements to Price Motors, Inc., listing the charges and credits against the dealer's reserve account in the name of Price Motors, Inc., the balance of the dealer's reserve account, and the outstanding conditional sales contracts of Price Motors, Inc. The amount in the dealer's reserve account was carried on the books of Price Motors, Inc., as another asset, 'Unearned Reserve—GMAC', and off-set the same amount as other liabilities.

"4. Price Motors, Inc., did not have a written agreement with GMAC relating to the sale and purchase of conditional sales contracts.

"5. During the year in question, since the dealer's reserve account did not equal or exceed five percent of the outstanding conditional sales contracts, no payments from the dealer's reserve account were made to Price Motors, Inc.

"6. The amount of tax paid by Price Motors, Inc., by reason of the Commissioner including the $6,218.61, as income for the year ending June 30, 1954, was $2,469.50, which is here claimed, plus interest.

"7. The sole issue under controversy and the matter for determination is whether the amount accumulated and held in the dealer's reserve account by GMAC between the period, November 2, 1953, and June 30, 1954, of the sum of $6,218.61, is income for the tax year ending June 30, 1954."

This case involves a question which has been the subject of much controversy and the appellate courts are sharply divided on the issue. The question is whether the reserve account in the hands of GMAC, which might or might not ever be available to the taxpayer, constitutes accrued taxable income for the year in question or is a contingent credit.

Under the stipulation, after the payments on the conditional sales contracts are properly paid then that portion of the reserve account which is held for the protection of these contracts, is paid directly to the taxpayer and is then reported by him as income. But the question here is whether or not that reserve constitutes income when it is possible that it might never be paid. The cases supporting the Commissioner's contention insist that this reserve constitutes income, whether received by the taxpayer or whether he had the right to receive said reserve during the taxable year. It is admitted that the taxpayer did not receive any sum from the reserve during the taxable year, and it is apparent that it had no right to receive it during the taxable year except upon the contingency that the conditional sales contracts were paid in full. In that event such portion of this reserve as was held for the protection of the accounts was paid to the taxpayer directly and he reported same as income.

But it is possible that this may never be paid to the taxpayer and that is such a contingency that causes this court to hesitate to hold that it is income when the taxpayer not only does not receive any portion thereof but does not have *the right to receive it.*

The court is impressed with a decision from the Fourth Circuit, Johnson v. Commissioner of Internal Revenue, 233 F.2d 952, 957, in which the court stated:

" * * * In the case at bar, as well as in Beaudry [43 B.T.A. 1209] and in Keasbey & Mattison [Co. v. United States, 3 Cir.], the reserves were always less than the maximum prescribed by the agreements, so that there was no reserve excess payable to the taxpayer. And in each case the reserve fund was subject to the payment of all notes discounted by the finance company. As the court said in Keasbey & Mattison: [141 F.2d 167] 'Whether the plaintiff [taxpayer] would ever acquire a fixed right to receive anything from the reserve fund was contingent and unascertainable throughout the taxable year.' "

The Fourth Circuit reaffirmed these principles in Long Poultry Farms, Inc.

v. Commissioner of Internal Revenue, 249 F.2d 726.

Quoting further from Keasbey & Mattison Company v. United States, 3 Cir., 141 F.2d 163, 166, cited in the Johnson Case, supra, the court stated:

"It is 'the right to receive and not the actual receipt' of an amount which determines its accruability. But the right to receive must have become fixed before the right can be said to have accrued. Spring City Foundry Co. v. Commissioner, 292 U.S. 182, 184, 185, 54 S.Ct. 644, 78 L.Ed. 1200. Consequently, until the right to an amount becomes accruable through the fixation of the right to receive, the taxpayer is under no obligation to return it as income. Otherwise he would be required to pay a tax on income which he might never have a right to receive. See North American Oil Consolidated v. Burnet, 286 U.S. 417, 423, 52 S.Ct. 613, 76 L.Ed. 1197. * * * "

The same theory was approved by the Fifth Circuit in Texas Trailercoach, Inc. v. Commissioner of Internal Revenue, 251 F.2d 395, 404, decided January 7, 1958, in which that court stated:

"This case shakes down to a few basic facts. In each credit sale of a trailer, the obligations of the purchaser, dealer, and finance company were inextricably interwoven in a single three-party agreement. The agreement gave the finance company virtually complete control over five per cent of the unpaid purchase price. The finance company exercised its control by withholding this five per cent in a special dealer's reserve account surrounded by various conditions precedent to payment. These conditions were contingencies which might have barred indefinitely the dealer's receipt of payments or the right to receive payments from the account. One of these contingencies, the proviso that the account exceed fifteen per cent of the unpaid balance on all trailer contracts, effectively barred the dealer from receiving or having the right to receive any amounts from the reserve account until nearly the end of the third year of the dealer's corporate existence. We hold, therefore, without generalizing beyond the logical necessities inherent in the facts of this case, that the amounts in this dealer's reserve account were contingent credits. They did not accrue in the taxable year when the finance company withheld the amounts and credited them on its books to the taxpayer."

▮ The court is not unmindful of a recent decision from the Sixth Circuit, Schaeffer v. Commissioner of Internal Revenue, 258 F.2d 861, 863, decided August 20, 1958, and is in sympathy with its reasoning, but there is a distinction between the facts in that case and the case at bar. The court stated:

" * * * The Commissioner did not include in taxable income all of the amounts added to the Loss Reserve accounts in a particular year, *but included only the net increases in such accounts*, after allowing for actual losses arising out of defaults occurring in each of the taxable years." (Emphasis supplied.)

The court then quoted from Spring City Foundry Company v. Commissioner, 292 U.S. 182, 184, 54 S.Ct. 644, 645, 78 L.Ed. 1200, the rule which is supported by the majority of the courts:

" * * * Keeping accounts and making returns on the accrual basis, as distinguished from the cash basis, import that it is the *right* to receive and not the actual receipt that determines the inclusion of the amount in gross income. When the right to receive an amount becomes fixed, the right accrues. * * * "

And continuing from the opinion in the Schaeffer Case, the court further said:

" * * * Basically, the cases sustaining the petitioners take the position that the amounts credited

to the Reserve Loss accounts were payable to the petitioner only upon various conditions precedent, which were contingencies which might bar indefinitely the dealer's receipt of the payments or the right to receive any payments at all from the account, thus constituting them contingent credits, rather than accrued income. The cases supporting the Commissioner's contention express the view that the amounts credited by the Finance Company to the Reserve Loss accounts were carried by the Finance Company and recognized by it as a liability in favor of the petitioner, that petitioner's legal right to them was undisputed, and that only the time of payment was deferred. * * * "

It will be observed that the holding in the Schaeffer Case is that "only the time of payment was deferred." If there was a definite basis for believing that time was the only element to be considered then this court would have no hesitancy in following the Schaeffer Case but that case does not take into consideration the proposition that the reserve may never be paid to the taxpayer, and if it is never paid, certainly it could not constitute income under any theory.

Thus the court concludes in this case that the right to receive does not exist until the taxpayer is in a position to receive or to demand the portion of the reserve which is held pending the full payment on the original contract, and if the right to receive does not exist then the reserve does not constitute income.

The position taken by the plaintiff herein is not prejudicial to the rights of the Government in any respect for when any portion of the reserve is paid to the taxpayer it is reported as income in the year received, therefore, the Government is fully protected.

This court recognizes the fact the Schaeffer Case from the Sixth Circuit may be a controlling case in this jurisdiction, however, this court is of the opinion the facts therein are distinguishable from those of the instant case.

The plaintiff is entitled to judgment as prayed. Findings of fact are unnecessary for the reason the facts have been stipulated and are a part of this opinion, and the conclusions of law as stated herein are sufficient. A form of judgment consistent with this opinion may be submitted within three days from this date. An exception is allowed the defendant.